**DRUMMOND CITIZENS INSURANCE CO. (Formerly Citizens Burial Insurance Co.), a Corporation, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. LR–68–C–67.**

United States District Court
E. D. Arkansas,
Western Division.

April 18, 1969.

E. J. Ball, Fayetteville, Ark., for plaintiff.

W. H. Dillahunty, U. S. Atty., Eastern Dist. of Ark., Little Rock, Ark., John O. Jones, Atty. in Charge, Dept. of Justice, Tax Div., Fort Worth, Tex., for defendant.

Memorandum Opinion

HENLEY, Chief Judge.

This tax refund suit, which is now before the Court on the cross motions of the parties for summary judgment, involves the 1962 federal income tax liability of Citizens Burial Insurance Co. of West Memphis, Arkansas, hereinafter Citizens, which during the tax year in question, and during prior and subsequent years, was an Arkansas life insurance company chartered as a "stipulated premium" insurer under the provisions of Act 137 of 1925, Pope's 1937 Digest of the Statutes of Arkansas, § 7820 et seq.

In 1965 the controlling stock in Citizens was acquired by Denver Roller of Little Rock who at the time owned the controlling stock in Drummond Insurance Co. and Drummond Funeral Home in that City. Thereafter, the two insurance companies were merged into a corporation known as Drummond Citizens Insurance Co., the nominal plaintiff in this case. While the suit directly involves 1962 only, it is the Court's understanding that the outcome hereof will affect the company's income tax liabilities for other years and may also have a bearing on the tax liabilities of certain other insurance companies in Arkansas.

During 1962 the principal line of insurance written by Citizens was burial insurance although it wrote a substantial amount of 20 pay endowment life insurance and some 15 pay endowment policies. Some of its policies provided small accidental death benefits. The company wrote no health insurance, and none of its policies were cancellable at the option of either the insurer or the insured.

Typically, a burial policy issued by Citizens provided that upon the death of the insured the Company would cause a qualified funeral director to provide funeral merchandise and a funeral service of a value not in excess of the face amount of the policy. It was provided that Citizens should have the right to designate the funeral director who was to furnish the merchandise and service.

During 1962 the controlling stockholders of Citizens were J. A. Johnson and Lucy Ruth Johnson. Those individuals operated, as partners, the Citizens Funeral Home in West Memphis, and it is fairly inferable that the corporation designated the partnership to provide merchandise and services for most, if not all, deceased persons covered by Citizens' policies.

Citizens filed a timely federal income tax return for 1962 and computed its tax liability on the theory that it was a life insurance company entitled to be taxed as provided by section 801 of the Internal Revenue Code of 1954. The return showed no tax to be due, and no tax was paid.

Subsequently, the Commissioner of Internal Revenue determined that Citizens was not within the scope of section 801 and was taxable under section 831, which is less favorable to insurance companies generally than section 801 is to life insurance companies falling within its terms. The result of that determination was that the Commissioner assessed a deficiency of about $42,000, which was paid. A claim for refund having been denied, this suit was timely filed.

Section 801 provides special income tax treatment for life insurance companies which come within the definition appearing in section 801(a). Other insurance companies are taxable under either section 821 or section 831.

Section 801(a) defines a "life insurance company" as follows:

"(a) Life insurance company defined.—For purposes of this subtitle, the term 'life insurance company' means an insurance company which is engaged in the business of issuing life insurance and annuity contracts (either separately or combined with health and accident insurance), or noncancellable contracts of health and accident insurance, if—

(1) its life insurance reserves (as defined in subsection (b)), plus

(2) unearned premiums, and unpaid losses (whether or not ascertained), on noncancellable life, health, or accident policies not included in life insurance reserves,

comprise more than 50 percent of its total reserves (as defined in subsection (c))."

Section 801(b) defines "life insurance reserves" as amounts computed or estimated actuarially and which are set aside to mature or liquidate, either by payment or reinsurance, future unaccrued claims arising from life insurance, annuities, and noncancellable health and accident insurance contracts involving at the time with respect to which the reserve is computed, life, health, or accident contingencies. With certain exceptions not here pertinent, "life insurance reserves" must be "required by law."

"Total reserves," as defined in section 801(c), are the sum of life insurance reserves, reserves for unearned premiums and unpaid losses, and all other reserves "required by law."

Pertinent Income Tax Regulations appear in Part 1.801 of Title 26, C.F.R., 26 C.F.R. § 1.801–1 et seq. Section 801–4 (3) and section 801–5(b) provide among other things that a life insurance reserve

or any other reserve is "required by law" if it is required by a specific State statutory provision or by a rule or regulation of a State insurance department. Section 1.801–3(e) defines "unearned premiums" as "being those amounts which shall cover the cost of carrying the insurance risk for the period for which the premiums have been paid in advance * * * whether or not required by law."

For purposes of the statute the amount of a given reserve is the mean between the amount of the reserve at the beginning of a taxable year and the amount of the reserve at the end of the taxable year, section 801(b) (5).

█ Whether a given life insurance company, including a company which writes burial or funeral insurance,[1] is taxable under section 801 is determined by comparing the sum of statutorily defined life insurance reserves and reserves for unearned premiums and unpaid losses with the total of the life insurance reserves, plus unearned premium and unpaid loss reserves, not included in insurance reserves, plus all other reserves required by law.

The comparison may be expressed in terms of a common fraction, the numerator of which consists of the company's "qualified reserves," and the denominator of which consists of the company's "total reserves." If that fraction is more than one-half, the company qualifies for section 801 tax treatment; otherwise, it does not. Alinco Life Ins. Co. v. United States, 373 F. 2d 336, 178 Ct.Cl. 813.[2]

Prior to, during, and after 1962 Citizens had set up and maintained five categories of "reserves."

The first category consisted of a deposit of securities with the Arkansas State Insurance Department as required by section 3 of Act 137 of 1925, Pope's Digest, § 7823, Ark.Stats., Ann., § 66–4407. That deposit amounted to $104,000, a sum which remained constant during the period with which the Court is concerned.

The next category was called "Aggregate Reserve For Life Policies." That reserve was computed actuarially; it increased during 1962, and the mean for that year was $10,279.

The third category was called "Single Premium and Paid Up Policies," and was in the amount of $20,656. The record reflects that that reserve was not computed actuarially and that it remained constant in amount from 1961 through 1964 notwithstanding annual increases in the business of the company. That particular reserve would appear to have related to outstanding single premium burial policies and paid up endowment policies.

The next category was called "Unearned Premium Reserve," and it was maintained by Citizens from 1961 through 1964 at the constant figure of $20,224. It was not based on any actuarial computation or estimate. When the books of Citizens were audited by an agent of the Internal Revenue Service, he increased that reserve for 1962 so that its mean figure was $115,866.

The final category of reserves bore the title "5% Twice and 10% Twice, plus Mortuary." That reserve, which had no actuarial basis, amounted to $86,989 at the beginning of 1962 and was increased to $177,955 as of the end of the year, the mean figure being $132,472.

1. No contention is made that burial or funeral insurance is not life insurance. It makes no difference whether the policy benefits are paid in money or in merchandise and services or both. 29 Am. Jur. Insurance § 8. See also the Arkansas statutory definition of life insurance appearing in Ark.Stats., Ann., § 66–2402.

2. In that case it is pointed out that the purpose of the statutory fraction is to deny 801 treatment to insurance companies selling both life insurance and other types of insurance if their volume of life insurance business is only one-half or less of their total volume measured by reference to the pertinent reserves.

The title of that reserve category is confusing to say the least and is probably not entirely accurate. It appears from an examination of all of the annual statements of record filed by Citizens with the Arkansas State Insurance Commissioner that Citizens never undertook to set up any actuarial reserves with respect to its ordinary burial policies but that it did earmark 30 percent of its burial policy premiums collected from year to year for the payment of funeral benefits.

The position of the plaintiff is that all of Citizens' reserves were "qualified reserves" and properly went into both the numerator and the denominator of the fraction which has been mentioned so that the ratio of qualified reserves to total reserves was 1 to 1.

The position of the Government is that while all of the reserves were properly to be placed in the denominator of the statutory fraction, only the actuarially computed "Aggregate Reserve for Life Policies" was entitled to be placed in the numerator so that the resulting fraction was much less than one-half.[3]

The Court agrees with the Government that plaintiff's motion for summary judgment must be denied. The Court also agrees that the Government is entitled to summary judgment dismissing the complaint. However, the Court reaches the latter conclusion by a route different from that which counsel for the Government would have it follow.

█ In the Court's estimation the controlling factor in this case is the status of Citizens during 1962 as a stipulated premium insurer chartered under the particular provisions of the 1925 Arkansas statute cited heretofore.[4] As the Court construes section 801, it presupposes a life insurance company having actuarially determined reserves for life insurance policies and for non-cancellable health and accident insurance policies, which reserves are required by law. In other words, the statute in the Court's opinion applies only to legal reserve life insurance companies, and a stipulated premium insurer in Arkansas in 1962 and other years was simply not such a company.

Act 137 of 1925 was a very liberal statute under the terms of which any five or more persons with a rather minimal amount of capital could without personal liability for debts or losses and with a minimum of security for policy holders write an unlimited amount of life insurance, including burial insurance.

The third subdivision of section 2 of the Act provided that the amount of authorized capital stock of such a company should be not less than $50,000 of which at least 20 percent should be subscribed and actually paid in cash and placed in the hands of the original board of directors.

Section 3 of the Act provided, among other things:

"First: That, every corporation incorporated or reincorporated under the provisions of this Act shall deposit with the State Insurance Commissioner either a certificate of deposit of a bank of this State or securities in which insurance companies are allowed by law to invest, a sum not less than ten thousand dollars ($10,000.00), before it shall commence business. This deposit shall be known as the guaranty fund and shall be held by the Insurance Commissioner for the purpose of guaranteeing the payment of

---

3. Alternatively, the Government contends that Citizens Burial Insurance Company, acting through Citizens Funeral Home was directly engaged in the funeral home business and was excluded from the scope of section 801 by the express provision of section 801(f). The Court finds it unnecessary to pass upon that contention which may involve a question of fact.

4. The Arkansas Insurance Code of 1959 provided that after January 1, 1960, no new stipulated premium insurance companies could be formed in this State. Ark.Stats., Ann., § 66–4404. The Court notes that Citizens was chartered as a stipulated premium insurer on December 29, 1959.

any valid claim against such corporation, company or association arising under one of its policies or certificates of insurance as determined by any court of final jurisdiction. In event such corporation, company or association should fail to pay any such judgment on account of the liability of the happening of a contingency insured against in its policy or contract of insurance after final judgment by a court of final jurisdiction in this State, the Insurance Commissioner is authorized to sell or dispose of a sufficient amount of the within described securities to liquidate such judgment. The Insurance Commissioner shall then notify the officers, directors and stockholders of such corporation, company or association that within sixty (60) days such amounts as have been used by him in the payment of such judgment shall be replaced so that the ten thousand dollars ($10,000.00) guaranty fund shall be kept intact. In event such officers, directors and stockholders of such corporation, company or association shall fail to replace such amounts as shall have been used by the Insurance Commissioner, under the above authority within the period above named, the Insurance Commissioner shall then revoke the license of such corporation, company or association to do business in this State until the above sum is made good.

"Second: That, the ten thousand dollars ($10,000.00) guaranty deposit may be either a part of the capital stock of the corporation or part of its surplus or undivided profits, but in every event, it shall be considered an asset and a part of the insurance fund of the corporation."

Section 4 of the Act defined a stipulated premium insurer as being: "Any corporation, company or association issuing policies or certificates promising money or other benefits to a member or policy holder, upon his disability, or to his legal representatives or beneficiaries designated by him, upon his decease, which mon-ey or benefit is derived from stipulated premiums collected in advance from its members or policy holders, and from interest and other accumulations, and which *does not set aside a fixed policy reserve such as is required of the legal reserve companies * * *."* (Emphasis added.)

Under section 5 of the Act, a stipulated premium insurer was deemed to be solvent so long as its total assets were equal to or in excess of its paid up capital stock, plus its bills payable, plus "any death or sick and accident claims approved for settlement or established as valid claims through a decision of a court of competent and final jurisdiction of this State." The section went on to provide that if the Insurance Commissioner should determine that a stipulated premium company was insolvent, he was to allow the company "a reasonable time, of not less than sixty (60) days in which to relieve the insolvency." It was further provided that if the insolvency shall not be relieved, the Commissioner was "to refer the matter to the Attorney General for the winding up of the affairs of the corporation in the same manner as the affairs of any other corporation of this State would be settled."

And section 7 of the Act provided specifically that no person "shall incur any personal liability for the losses or liabilities of any corporation, company or association transacting business under the provisions of this Act."

In 1959 the Arkansas Legislature adopted a comprehensive insurance code, Act 148 of 1959, which became effective on January 1, 1960. It is evident that stipulated premium insurers were not viewed with favor by the draftsmen of the Code, and, as noted heretofore, the Code prohibited the formation of new stipulated premium companies after January 1, 1960. However, the Code did not purport to interfere with the charters of existing stipulated premium insurers and perhaps could not have done so constitutionally. Trustees of Dartmouth College v. Woodward, 4 Wheat. (17 U.S.)

518, 4 L.Ed. 629. Nor was the formation of new stipulated premium companies prohibited during the several months that elapsed between the adoption of the Code and its effective date.

Thus, stipulated premium insurers in existence prior to the effective date of the Code could continue to write policies without legal reserves even after the Code went into effect. However, the powers of stipulated premium insurers were sharply curtailed when the Legislature adopted Act 393 of 1967, Ark.Stats., Ann., §§ 66–4402 and 66–4411.

Section 66–4402(2) provides:

"(2) Reserves.—Stipulated premium insurers shall be required to maintain reserves on all life insurance policies, annuity and endowment contracts and disability insurance policies issued on and after January 1, 1968, in the following manner: (a) Reserves on all such life insurance policies and annuity and endowment contracts shall be established and maintained in accordance with the provisions of the standard valuation law, Section 29 of Act 148 of the 1959 Acts of Arkansas as amended [Arkansas Statutes (1947) Section 66–2511]."

And section 66–4411 provides that from and after January 1, 1968, the capital of a stipulated premium insurer shall be deemed to be impaired and such insurer shall be deemed insolvent when "such insurer is not possessed of assets equal to all liabilities including the reserves set forth in section (66–4402[2].), together with its total issued and outstanding capital stock."

Thus it is seen that from 1925 to 1968 persons holding policies issued by stipulated premium insurers in Arkansas had no legally required reserves to protect them, and their only protection outside of the assets of their companies was the "guaranty fund" called for by section 3 of the 1925 statute. That fund was not an "insurance reserve" set up to mature or liquidate future unaccrued claims of policy holders but was simply a deposit of securities to satisfy judgments which insureds might obtain against a particular company.

The Court does not question the soundness or solvency of Citizens during earlier years or the soundness or solvency of its successor at the present time or at any other time. Nor does the Court question the fact that the reserves which have been described have in fact been established and maintained, and the Court does not question the adequacy of the reserves. The fact remains, however, that none of the categories of reserves established by Citizens, except the guaranty deposit, was required by statute, and none of them, except the "Aggregate Reserve For Life Policies," was computed or estimated on any actuarial basis.

Section 26 of the Arkansas Insurance Code, Ark.Stats., Ann., § 66–2111, gives rather broad rule making powers to the Arkansas State Insurance Commission, but provides that no rule or regulation promulgated by the Commissioner shall extend, modify, or conflict with any law of the State or the reasonable implications thereof.

In view of that limitation on the Commissioner's regulatory power, the Court doubts that with respect to 1962 the Commissioner could lawfully have promulgated any rule or regulation which would have required stipulated premium insurers to do anything but maintain the guaranty fund that has been mentioned. It is not necessary for the Court to pursue that question, however, because the Commissioner at the request of the Court has certified under his seal of office that "during the year 1962 there was no rule, regulation or order requiring that stipulated premium insurers establish and maintain reserves for insurance issued by such type of insurers," and he certified further that there was no such rule, regulation or order which would have required Citizens, as an individual insurer, to maintain such reserves. The Commissioner's certificate has been made a part of the record in the case.

The reserve categories established by Citizens may have been the result of an exercise of business judgment on the part of the Johnsons or they may have been the result of some informal requirement of some examiner of the State Insurance Department, but they were not "required by law" within the meaning of the Internal Revenue Code and the pertinent Regulations.

It is familiar law that changes in reserves can affect substantially the income tax liability of insurance companies entitled to be taxed as provided by section 801. Reserves that are required by law and that are actuarially computed are not subject to the uncontrolled discretion or judgment of those in charge of a particular life insurance company. In the case of a stipulated premium insurer chartered under the 1925 Arkansas statute, however, the amounts of such reserves as the insurer may voluntarily choose to establish are within the insurer's discretion and may be changed at will. Thus, by adjusting the amounts of its voluntary reserves from year to year such an insurer may be able to obtain tax advantages not available to legal reserve insurers, which advantages the Court does not believe that Congress intended stipulated premium companies to have.

The Court's attention has been called to the fact that National Protective Insurance Co. v. C. I. R., 8 Cir., 128 F.2d 948, a case arising under the Revenue Acts of 1934 and 1936, involved a Missouri stipulated premium insurer. However, the opinion of the Court makes it clear that under Missouri law such an insurer was required to establish and maintain "standard death reserves on its life insurance contracts, consisting of such amounts out of the premiums as, improved with interest at 3½ per cent per annum, would discharge its contingent liabilities on the basis of the American Experience Table." 128 F.2d at 949. As has been seen, Arkansas had no comparable requirement for stipulated premium insurers until Act 393 of 1967 became effective.

An order will be entered overruling plaintiff's motion for summary judgment, granting the Government's motion, and dismissing the Complaint.