**UNITED BENEFIT LIFE INSURANCE COMPANY, a Corporation, Appellant,**

v.

**James L. McCRORY, Appellee.**

**No. 19439.**

United States Court of Appeals
Eighth Circuit.

Aug. 7, 1969.

Harold W. Kauffman of Gross, Welch, Vinardi, Kauffman, Schatz & Day, Omaha, Neb., for appellant, Joseph J. Vinardi and William A. Day, Jr., on the brief.

Thomas L. Stapleton, Atty., Dept. of Justice, Washington, D. C., for appellee, Johnnie M. Walters, Asst. Atty. Gen., and Lee A. Jackson and Gilbert E. Andrews, Attys., Dept. of Justice, Washington, D. C., and Richard A. Dier, U. S. Atty., Omaha, Neb., on the brief.

Before BLACKMUN, MEHAFFY and LAY, Circuit Judges.

LAY, Circuit Judge.

This involves an appeal by a taxpayer insurance company from a judgment of the district court in favor of the District Director of Internal Revenue. The suit arises out of a claim for refund of federal income taxation for each of the

years 1954 through 1957 under 28 U.S.C. § 1340 and § 1346(a) (1). The claim involves income taxes assessed against the taxpayer and interest thereon of $71,837.46 for the year 1954, $64,158.31 for 1955, $60,472.39 for 1956 and $50,101.50 for 1957. These sums were paid in January of 1959. In May of that year the taxpayer made separate claims for refunds which were disallowed, resulting in the commencement of this action against the Director in December of 1959. The issue presented is whether reserves set aside under health and accident policies for payment of amounts still unaccrued on claims from permanent and total disability qualify as "life insurance reserves" under Section 803(b) of the Internal Revenue Code of 1954. The district court, Honorable Richard E. Robinson, held they do not. United Benefit Life Ins. Co. v. McCrory, 242 F.Supp. 845 (D.Neb.1965). We affirm.

Analysis of the problem requires a brief historical resume. Prior to the year of 1921, all insurance companies regardless of classification, were taxed on their gross premium income, as well as any investment return. The Revenue Act of 1921 recognized the inequity of requiring life companies to report their premium receipts as income since life companies were required to set up certain reserves out of the premiums. These insurance reserves were designated for the payment of unaccrued claims and contingent liabilities and would eventually be paid out to policy beneficiaries. By the Act of 1921 life insurance companies were required to report only their interest, dividends and rents and not their premium income. The Revenue Act of 1924 for the first time also recognized preferential treatment to the net income gained from "reserve funds required by law." 26 U.S.C.A. (Revenue Act 1924) §§ 242, 244 and 245. This legislation continued the taxation scheme set up in the Act of 1921, whereby reserves out of premiums were no longer deductible since the premiums themselves were not taxed, but gave to the companies the additional preference to exclude that portion of reported income which was added to the reserves as interest. This is explained in Commissioner of Internal Revenue v. Pan-American Life Ins. Co., 111 F.2d 366, 368 (5 Cir.1940), aff'd, Helvering v. Pan-American Life Ins. Co., 311 U.S. 272, 61 S.Ct. 210, 85 L.Ed. 183 (1940), wherein the court said:

> "*The purpose of Congress in allowing these deductions is obvious.* By the provision enacted in 1921, life insurance companies for the first time were taxed upon their investment income only, and no deduction was allowed for claims paid to policy holders or for net additions made to reserve funds, as insurance companies classed 'other than life' were permitted by the act to do. *Apparently, Congress recognized that life insurance companies were required by law to maintain numerous reserves comprising a large proportion of their total assets. Being thus deprived of potential investment returns, and being required to credit such reserves with compound interest annually, the deduction was allowed as a necessary compensation for earnings foregone by compliance with the law.*" (Emphasis ours.)

Further explanation of the basis for this exclusion is found in Commissioner of Internal Revenue v. Monarch Life Ins. Co., 114 F.2d 314 (1 Cir.1940). In *Monarch* the troublesome question of what reserve funds actually should qualify under the Internal Revenue Code was litigated. The court stated as follows:

> "Since this interest was required by law to be credited to the reserves, Congress allowed this deduction '*as a necessary compensation for earnings foregone by compliance with the law*'.
>
> \* \* \* \* \* \*
>
> "The test *is not whether the amount credited to the reserve 'belongs' to the company or to the insured, but whether it is that sort of gross income which Congress considered should be treated as net income for taxation*

*purposes. This depends on whether the income is available for the general purposes of the company.* Maryland Casualty Co. v. United States, [251 U.S. 342, 40 S.Ct. 155, 64 L.Ed. 297], supra. *Amounts set aside in reserve funds, whether life or casualty reserves, are not so available and, therefore, are to be deducted from gross income.* 'Reserve funds required by law' included reserves other than life reserves prior to the Revenue Act of 1921, and meant all technical insurance reserves." (Emphasis ours.) *Id.* at 324.

The actual formula by which these companies were taxed was complex because of the unique nature of the life insurance business, however, the detail of the statutory formulae as to rates is immaterial to the problem. It is only relevant here to recognize that in the years 1955 through 1957, the statutory formula governing life companies taxed only about one-eighth of the net investment income attributable to "life insurance reserves" but substantially all investment income attributable to non-life insurance reserves. Life Insurance Co. Tax Act for 1955, ch. 83 §§ 801–805, 70 Stat. 36.[1] And although the law governing the taxable income for 1954 was different, nevertheless, preference was also given to "life insurance reserves" as opposed to non-life insurance reserves.[2]

■ The issue here is simply stated. Taxpayer's claim of refund focuses upon whether its reserves qualify as "life insurance reserves" under a noncancellable health and accident insurance contract. If they do, United Benefit's tax for the years in question is less and its claim

must be recognized. If they do not, the district court judgment must stand.

The 1942 amendment to the Internal Revenue Code of 1939 defined "life insurance reserves" for the first time. Int.Rev.Code of 1939, § 201(b), as amended, ch. 619, § 163(a), 56 Stat. 798. This statutory definition has carried through to the present time without substantial change. This definition appeared in Section 803(b) of the Internal Revenue Code of 1954 and governs the years 1952 through 1957 which are now in issue. This section reads in part as follows:

"LIFE INSURANCE RESERVES. —The term 'life insurance reserves' means amounts which are computed or estimated on the basis of recognized mortality or morbidity tables and assumed rates of interest, and which are set aside to mature or liquidate, either by payment or reinsurance, *future unaccrued claims arising from life insurance, annuity, and noncancellable health and accident insurance contracts* (including life insurance or annuity contracts combined with noncancellable health and accident insurance) involving, at the time with respect to which the reserve is computed, life, health, or accident contingencies. Such life insurance reserves, except in the case of policies covering life, health, and accident insurance combined in one policy issued on the weekly premium payment plan, continuing for life and not subject to cancellation and except as hereinafter provided in the case of assessment life insurance, must also be required by law." (Emphasis ours.)

1. The taxation scheme has now once again been changed by the Life Insurance Co. Tax Act of 1959. Int.Rev.Code of 1954, §§ 801–806, 73 Stat. 112. But as the government points out, the legal question involved in this case is a continuing one even under the 1959 Act since the taxation of "life insurance reserves" still includes reserves set aside for "noncancellable health and accident insurance contracts." See Treas.Reg. § 1.801–3 (c) and § 1.801–4 (1959).

2. In 1954, the company's net investment income was increased by eight times the amount of the "adjustment for certain reserves." This adjustment was equivalent to 3¼ percent of unearned premiums and unpaid losses on contracts which are not included in life insurance reserves. Int.Rev.Code of 1954, §§ 801–809 ch. 736, 68A Stat. 255.

The record reflects that health and accident insurance policies fall into three general classifications: (a) noncancellable and guaranteed renewable—that is when the policy will be continued as long as the premiums are paid and the amount of the premium cannot be raised, (b) guaranteed renewable—when the insured has the right to perpetuate or renew the contract but the insurer reserves the right to raise the amount of the premium on a class basis, and (c) cancellable—when the insurer can either terminate with proper notice or can refuse to renew at the end of the contract period. Under the health and accident policies in question the company had an option to renew its policy each year. However, once an injury or disability had occurred there was an automatic continuation of the policy and a waiver of all further premiums during the period of disability. It is because of the latter obligation that the taxpayer urges that the reserves in question qualify under Section 803(b). Such reserves, it is argued, relate to future unaccrued claims in a *noncancellable* health and accident insurance contract.

The trial court held that it is only those policies which require an active life reserve that qualify under Section 803(b) for preferential treatment. The evidence shows that although there exists essential difference between active life reserves and disabled life reserves, they both are determined from mortality or morbidity tables and as required by Section 803(b) have an assumed rate of interest. Disabled reserves are those set aside after a claim has occurred and are used to meet future unaccrued payments which will fall due as the disability continues. Active life reserves are established from the inception of the policy and are accrued from excess premium payments in the early years of the policy. The active life reserves are necessary because the policy will be maintained by a set premium while the probability of greater risks will increase.

The taxpayer can find no refuge for its policies in the various existing definitions of "noncancellable" health and accident contracts. Most definitions encompass the "active reserve" concept and the guaranteed renewal of both contract and premium rate.

As set forth in the legislative history of the 1942 amendment, "Since noncancellable contracts of health and accident insurance require the accumulation of substantial reserves against increased future risks the writing of such insurance is analogous to life insurance and the definition has been changed to permit such companies to be taxed as life insurance companies." H.Rep.No. 2333, 77th Cong., 1st Sess. (1942), 1942–2 Cum.Bull. 372, 453–54.

The Senate Report reads:

"Technical changes are made to distinguish in a clearer manner the types of insurance contracts included and to emphasize the fact that the unearned premiums and unpaid losses on noncancelable life, health, or accident policies, not included in life insurance reserves, are included for purposes of the definition of a life insurance company only. * * * The unearned premiums and unpaid losses on noncancelable life, health, or accident policies, not included in life insurance reserves, are added to such reserves in determining whether a company is to be considered a life insurance company. The life insurance reserves defined in subsection (c) (2) as they pertain to noncancelable health and accident insurance policies are those amounts which must be reserved, in addition to unearned premiums, to provide for the additional cost of carrying such policies in later years when the insured will be older and subject to greater risk and when the cost of carrying the risk will be greater than the premiums then being received." S.Rep.1631, 77th Cong., 2d Sess. (1942), 1942–2 Cum.Bull. 504, 611–12.

The Treasury regulation adopted September 4, 1956, (effective only for the taxable year 1954) defined a noncancell-

able policy as "a contract which the insurance company is under an obligation to renew or continue at a specified premium and with respect to which a reserve in addition to the unearned premium must be carried forward to cover that obligation." Treas.Reg. 1.801–1a. For similar interpretative specific application see Rev.Rul. 476, 1956–2 Cum. Bull. 468 and Rev.Rul. 256, 1955–1 Cum. Bull. 405, defining life insurance companies.

Nor can the taxpayer find support from the definition of noncancellable insurance contracts set forth by the National Association of Insurance Commissioners:

> "The terms 'noncancellable' or 'non-cancellable and guaranteed renewable' may be used only in a policy which the insured has the right to continue in force by the timely payment of premiums set forth in the policy 1) until at least age 50, or 2) in the case of a policy issued after the age 44, for at least five years from its date of issue, during which period the insurer has no right to make unilaterally any change in any provision of the policy while the policy is in force." NAIC, Report to the National Association of Insurance Commissioners' Subcommittee on Definition of Non-cancellable Insurance and Guaranteed Renewable Insurance 156 (1960).

Notwithstanding the apparent exclusion of the taxpayer's policies from the above definitions of noncancellable contracts, taxpayer argues that the "active reserve" concept does not foreclose a diability reserve from qualifying under Section 803(b). United Benefit argues that favorable consideration is given to disabled life reserves of a noncancellable contract. This point the government concedes. Disability reserves of *noncancellable* health and accident insurance contracts are necessarily included in the overall definition of "life reserves" under Section 803(b), in that they arise from a contract noncancellable from its inception. Taxpayer urges that once a disability claim occurs, its policy becomes a noncancellable contract as to both renewal and premium rate and therefore its disability reserve should likewise qualify under Section 803(b). The company urges in this regard that the district court erred (1) in failing to distinguish between its cancellable *policy* and its noncancellable *contract* which arises within the policy upon the event of disability of the insured; and (2) in failing to heed the traditional congressional policy of taxation, that is, taxation of only that income which benefits the company.

We turn to these contentions. Taxpayer relies upon a variety of cases demonstrating a substantive difference between a "policy" of insurance and a "contract" of insurance. It is contended that although the company issues a cancellable policy of health and accident insurance that within the policy there exists severable insurance contracts defining severable obligations. It is said that upon a disability claim occurring, its obligation then becomes fixed and that portion of the policy relating thereto becomes a "noncancellable" contract within Section 803(b). It is argued that because of the indistinguishable similarity between the disabled reserve of this policy and the disabled reserve of any noncancellable health and accident policy (qualified under Section 803(b) ) that Congress intended different meanings to the terms "policy" and "contract" within Section 803(b) itself.

 Although we cannot help but praise the ingenuity of such a theory, we cannot find authoritative support for it. It is generally recognized throughout the law that "The *policy* is the *evidence* delivered to the insured of the *contract* of the insurer, and ordinarily, of itself, constitutes complete evidence of the contract * * *." (Emphasis ours.) See American Credit Indemnity Co. v. Wood, 73 F. 81, 84 (2 Cir.1896); 43 Am.Jur. Insurance § 197 (1969); 44 C.J.S. Insurance § 223 (1945). And although there may be different connotations to the terms "contract" and "poli-

cy" in different factual contexts,[3] there is no showing here that Congress intended any substantive difference between the two terms in Section 803(b). In fact, the legislative history demonstrates interchangeable usage by definition. The term "contract" refers to the entire policy agreement and the word "policy" refers to the "contract." As the H.Rep.No. 2333 states:

"As the term is used in the industry, a noncancelable insurance *policy* means a *contract* which the insurance company is under an obligation to renew at a specified premium, and with respect to which a reserve in addition to the pro rata unearned premium must be carried to cover the renewal obligation." (Emphasis ours.) H. Rep. 2333, 77th Cong., 2d Sess. (1942), 1942–2 Cum.Bull. 372, 454.

Perhaps the most logical refutation to taxpayer's argument is that if the disabled reserve fund of cancellable policies may qualify under Section 803(b) as falling within the definition of noncancellable contracts, there would have been no congressional necessity to single out "noncancellable" health and accident contracts within the statute itself. To adopt taxpayer's interpretation, *all* health and accident policies would qualify under Section 803(b) at the time a disabled reserve is established since they all would become noncancellable at that time. This clearly was not intended. Additionally, as will be discussed, it is evident there existed congressional reason to exclude cancellable policies from Section 803(b).

This brings us to taxpayer's second contention, that favorable treatment to disability reserves under its policies finds foundation in traditional concepts relating to congressional policies of taxation. This view is best related in Massachusetts Protective Ass'n v. United States, 114 F.2d 304, 312, 313 (1 Cir. 1940):

"*Congress is only interested in determining what part of a company's gross income should be treated as net income for the purposes of taxation.* McCoach v. Insurance Co. of North America, 1917, 244 U.S. 585, 37 S.Ct. 709, 61 L.Ed. 1333. In general, premium income is not such, and its inclusion in gross income is only justified by the deductions allowed. See Hearings before the Committee on Ways and Means on the Revenue Act of 1918, 65th Cong., 2nd Sess., Pt. 1 (1918) 811. *The additional reserve for non-cancellable health and accident policies, whether returnable to the insured or not, is not available for the use of the general purposes of the plaintiff.* It is held as a liability to provide for the payment or reinsurance of specific contingent insurance liabilities proven by experience to be a part of the cost of this particular type of insurance in the future years.

\* \* \* \* \* \*

"As long as these reserve funds must be held to provide for expected insurance liabilities in the future on these non-cancellable health and accident policies *and are not to be used for the general purposes of the company, they are not 'earned premiums'* within the meaning of Congress and not includible in gross income. *The test is not whether the part of the premium set aside in the reserve for non-cancellable health and accident insurance 'belongs' to the company in the event of cancellation or lapsing of the policy, but whether that amount is such a part of the company's gross income as Congress considered should be treated as net income for the purposes of taxation.* McCoach v. Insurance Co. of North America, *supra.* We hold that it is not." (Emphasis ours)

---

3. For example, as in many of the cases relied upon by taxpayer, a policy need not issue to establish a contractual relationship between the insurer and its insured. Cf. e. g. National Life & Accident Ins. Co. v. Holbrook, 100 F.2d 780, 782–783 (5 Cir. 1939); United Founders Life Ins. Co. v. Carey, 347 S.W.2d 295, 305 (Tex. Civ.App.1961).

See also Helvering v. Oregon Mut. Life Ins. Co., 311 U.S. 267, 61 S.Ct. 207, 85 L.Ed. 180 (1940).

However, prior to the 1942 amendment of the I.R.C. in Commissioner of Internal Revenue v. Monarch Life Ins. Co., 114 F.2d 314, 325 (1 Cir.1940), when *all* reserve funds qualified for preferential treatment, the court significantly commented:

> "If Congress had intended to limit the reserve deduction to life reserves it could easily have said so. In the absence of explicit language, the general meaning of the words as previously construed to apply to other than life reserves should be accepted. Commissioner [of Internal Revenue] v. Oregon Mutual Life Insurance Co., *supra*, 112 F.2d [468] at page 470."

Taxpayer's approach basically overlooks the congressional attitude behind the ensuing 1942 and 1955 amendments. The legislative history set forth in the Senate Report pertaining to the Revenue Bill of 1942 relates:

> "Subsection (c) of section 202 (relating to adjustment for certain reserves) is new and changes section 201(g) of the House bill to apply the adjustment for certain reserves to other cancelable contracts as well as cancelable health and accident contracts, and to add the adjustment to the tax base rather than to net income. Such addition to the tax base will offset the reserve and other policy liability credit. *Under existing law a life insurance company writing health or accident or other insurance contracts is taxable only on investment income and since there is very little investment income derived from the investment of premiums on such contracts, the real income from the accident and health and other business, which is derived from premiums, is not taxed. Similar contracts written by an insurance company subject to the tax imposed by section 204 are taxable on both investment and underwriting income from such contracts.*

The segregation of cancelable health and accident and other insurance business written by life insurance companies and making the income therefrom taxable under section 204 or 207, as the case may be, was considered. However, this was objected to on the ground that it would result in litigation because of the difficulty in determining the proper apportionment of items of expense and income properly allocable to such business and that the segregation for reports to State insurance commissioners is arbitrary and unsatisfactory.

> "In order to provide a more easily determinable tax base *for the cancelable health and accident and other business of life insurance companies, it is provided that interest on the unearned premiums and unpaid losses on cancelable health or accident or other business be included in the tax base as determined for life insurance companies.* The interest on these reserves would be computed at 3¼ per cent, the average rate of interest that is allowed life insurance companies. In addition, in order to eliminate inequities among companies writing policies requiring unearned premiums of widely varying size, it is provided that unearned premiums be considered to be not less than 25 per cent of net premiums written during the taxable year on such policies." (Emphasis ours.) S. Rep.No. 1631, 77th Cong., 2d Sess. (1942), 1942–2 Cum.Bull. 504, 614–615.

Similar reasoning is seen in the legislative history of the Insurance Company Tax Act for 1955 where the House Report states:

> "*Investment income on nonlife insurance business has been taxed at full corporation rates.* The amount of this income has been determined at 3¼ percent of the reserves *on nonlife insurance* (cancelable accident and health, workmen's compensation, etc.).

> \* \* \* \* \* \*

"Early in January of this year the subcommittee issued a report with the following tentative conclusions:

"(a) That the same tax formula should be applied to both stock and mutual companies with respect to life insurance business.

"(b) That the discrimination against insured plans compared to tax-free trusts in the employee pension and profit-sharing area be removed.

"(c) *That income from cancelable accident and health insurance business carried on by life insurance companies be taxed separately from income from life insurance business and that it be taxed in the same manner as the income of casualty companies is taxed.*

\* \* \* \* \* \*

"*With respect to non-life insurance business, primarily accident and health insurance, the bill moves in the direction of equalizing the tax treatment of life and casualty insurance companies. It is provided that both stock and mutual life insurance companies will pay tax on the income from this business as if it were the income of a mutual casualty insurance company.*" (Emphasis ours.) H.Rep.No.1098, 84th Cong., 1st Sess. (1956), 1956–1 Cum.Bull. 954, 955.

This history makes clear the fact that Congress intended to segregate the *cancellable* accident-health business of life insurance companies to be taxed in accordance with rules of non-life insurance companies. The primary reason was to adjust the treatment of stock and mutual companies in their non-life insurance business in an attempt to equalize their burden with the tax burden generally imposed upon non-life companies. See Vichery, Insurance Under the Federal Income Tax, 52 Yale L.J. 554, 577 (1943); Note, Tax on Life Insurance Companies, 25 Ford.L.R. 780, 785 (1957).

This congressional intent was acknowledged in United States v. Occidental Life Ins. Co. of Cal., 385 F.2d 1 (9 Cir.1967). In determining its "adjustment for certain reserves" the taxpayer there *included* as an "unpaid loss" the amount of its reserves for amounts not yet due on accrued claims and for continuing benefits. These losses are identical to the disability reserves in the instant case. They were *voluntarily* included within the cancellable contract group. At issue, however, and not included were the monies which were for taxpayer's accrued but unpaid liability. The court of appeals held that the taxpayer was required to include as "unpaid losses" the amount of its accrued but unpaid non-life policy liabilities, as well as the amount of its unaccrued claims. In discussing the basic reason for making a distinction as to non-life policies, the court said:

"The Revenue Act of 1942 made significant changes in the taxation structure for life insurance companies, and these changes were generally reenacted in the original version of the 1954 Code. In the first place, Congress chose to treat noncancellable accident and health insurance contracts in the same manner as life insurance contracts, the reason being that these other noncancellable policies also require the accumulation of substantial reserves against increased future risks." *Id.* at 5.

"We have previously remarked that only a small percentage of the investment income of a life insurance company represents true income, since most of those receipts will eventually be returned to policy holders.

\* \* \* \* \* \*

"This deduction [of all investment income placed in reserves] alone, however, would create a significant inequity. Cancellable insurance policies require the establishment of unearned premiums and unpaid losses reserves, but they do not require the laying

aside of a substantial part of the investment income for eventual return to the policy holders. Since a life insurance company was not required, for tax purposes, to segregate its income according to the sources of the reserve funds that produced the income, its deduction would be attributable in part, assuming it carried on such other business, to income earned on funds acquired through the sale of cancellable forms of insurance. In contrast, insurance companies which did not qualify as life insurance companies were not entitled to the reserve and other policy liability deduction. *Therefore, a life insurance company also engaging in non-life business would receive a deduction of a portion of its income from that business, while a non-life insurance company engaging in non-life business identical to that carried on in part by the life company would not.* The 'adjustment for certain reserves' of section 806 was intended to remedy this inequity. *The reports of the Congressional committees which studied this section prior to its enactment in 1942 make it evident that the purpose was to tax a life insurance company on the investment income from its cancellable insurance business, so that its burden would reasonably match those imposed on other types of insurance companies.*" (Emphasis ours.) *Id.* at 7.

It seems clear that congressional policy of taxation in the 1942 and 1955 amendments of the Revenue Code of 1939 excluded consideration of any reserve set up under *cancellable* health and accident contracts of a life company. It is apparent that traditional approaches to taxation became secondary to the congressional recognition of the need to equalize the overall tax burden of the life company engaged in non-life business with the non-life company engaged in similar underwriting.

Judgment affirmed.