**GROUP LIFE & HEALTH INSURANCE COMPANY, Plaintiff-Appellee,**

v.

**UNITED STATES of America, Defendant-Appellant.**

**No. 28992.**

United States Court of Appeals, Fifth Circuit.

Nov. 5, 1970.

Rehearing Denied and Rehearing En Banc Denied Jan. 8, 1971.

Johnnie M. Walters, Asst. Atty. Gen., Lee A. Jackson, Atty., Tax Div., Dept. of Justice, Washington, D. C., Jerry B. Wells, Tax. Div., Dept. of Justice, Eldon B. Mahon, U. S. Atty., Fort Worth, Tex., William L. Goldman, Atty., Dept. of Justice, Tax Div., Washington, D. C., for defendant-appellant.

O. Jan Tyler, Robert K. Sands, Wright Matthews, Dallas, Tex., for plaintiff-appellee.

Before GEWIN, MORGAN and ADAMS,* Circuit Judges.

ADAMS, Circuit Judge:

This case presents an important and difficult question concerning the Federal taxation of guaranteed renewable health and accident insurance companies under Subchapter L, Part I, § 801 et seq. of the Internal Revenue Code of 1954.

Plaintiff Group Life and Health Insurance Company ("Group Life") underwrites and issues group insurance in Texas under the plan known as Blue Shield. Group Life's parent corporation, Group Hospital Service, Inc., issues insurance in Texas under the plan known as Blue Cross. Group Life brought this income tax refund action in the District Court for the Northern District of Texas on the basis that it is entitled to be taxed as a "life insurance company" as defined by § 801(a)[1] of the Internal Revenue Code of 1954 ("the Code"), 26 U.S.C.A. § 801(a). The District Court upheld Group Life's claim and the United States appealed.

The question raised is whether the District Court erred in finding that Group Life's "Non-Cancellable, Experience Rated Medical-Surgical Insurance Policy" qualified as "guaranteed renewable life, health, and accident insurance" within § 801(e)[2] of the Code, and whether therefore Group Life qualifies to be taxed as a "life insurance company" within the definition of § 801(a) of the Code. This question depends, in turn, on the validity of § 1.801–3(d) of the Income Tax Regulations ("the Regulations"), 26

C.F.R. § 1.801–3(d): "The term 'guaranteed renewable life, health, and accident policy' means a health and accident contract * * * which is not cancellable by the company but under which the company reserves the right to adjust premium rates by classes in accordance with its experience under the type of policy involved, and *with respect to which a reserve in addition to the unearned premiums * * * must be carried to cover that obligation * * *"* (emphasis added).

To understand the argument that the issuer of Blue Shield group policies may be entitled to be taxed as a life insurance company requires an examination of the history of income taxation of insurance companies.[3]

Since the enactment of the Revenue Act of 1921,[4] the income of life insurance companies has been taxed differently from that of other corporations. In section 242 of the 1921 Act, Congress decided that a company should be taxed as a life insurance company if it were "engaged in the business of issuing life insurance (including contracts of combined life, health, and accident insurance)", and if the company maintained "for the fulfillment of such contracts" a reserve which comprised "more than 50 per centum of its total reserve funds." Such companies were allowed, among other benefits, to exclude premium income from their computation of taxable income because such receipts "were not true income but were analogous to permanent capital investment." Helvering v. Oregon Mutual Life Insurance Com-

---

* Of the Third Circuit, sitting by designation.

1. § 801(a) Life Insurance Company Defined—For purposes of this subtitle, the term "life insurance company" means an insurance company which is engaged in the business of issuing life insurance and annuity contracts (either separately or combined with health and accident insurance), or noncancellable contracts of health and accident insurance, * * *"

2. § 801(e) provides that guaranteed renewable life, health, and accident insurance shall be treated the same as non-

cancellable, life, health, and accident insurance.

3. For a comprehensive review of the history of the income taxation of life insurance companies, see Alinco Life Insurance Co. v. United States, 373 F.2d 336, 345–349, 178 Ct.Cl. 813 (1967); Vickrey, Insurance Under the Federal Income Tax, 52 Yale L.J. 554 (1943); Mertens, Law of Federal Income Taxation, § 4401 (Zimit ed. 1964).

4. Law of November 23, 1921, ch. 136, 42 Stat. 227.

pany, 311 U.S. 267, 269, 61 S.Ct. 207, 208, 85 L.Ed. 180 (1940). This concept was based on the premise that premiums received in the early years of a level-payment life insurance policy must be invested in order to satisfy risks which increase with the age of the insured. Payments received in the early years exceed the cost of the risks insured in the early years, and such premiums thereby augment premiums for later years which would otherwise be insufficient to insure the risks which develop in later years. Significantly this characterization of a life insurance company for federal income tax purposes, set forth in the 1921 Act, made the policy reserves of a company the touchstone of the category in which it was to be placed. Alinco Life Insurance Co., *supra*, 373 F.2d at 347; *see also* Commissioner of Internal Revenue v. Swift & Co., E.B.A., 151 F.2d 625 (7th Cir. 1945).

Defining insurance companies in terms of their reserves for tax purposes next led Congress to recognize that "noncancellable" health and accident policies ought to be treated similarly to life policies. This is so because an insurance company in issuing noncancellable health and accident policies makes provision in the early years for the increased actuarial risks in later years, and has a reserve to reflect this fact. The Revenue Act of 1942,[5] therefore, expanded the class of corporations taxable as life insurance companies to include those issuing noncancellable health and accident policies. The Senate Finance Committee explained the rationale for such treatment as follows:

"Since noncancellable contracts of health and accident insurance require the accumulation of substantial reserves against increased future risks, the writing of such insurance is analogous to life insurance * * * The life insurance reserves defined in * * * [§ 201] (c) (2) [superceded by § 801(b) of the present code] as

they pertain to noncancellable health and accident insurance policies are those amounts which must be reserved, in addition to unearned premiums, to provide for the additional cost of carrying such policies in later years when the insured will be older and subject to greater risk and when the cost of carrying the risk will be greater than the premiums then being received." S.Rep. No. 1631, 77th Cong., 2d Sess. (1942–2 Cum.Bull. 504, 611–612).

To accommodate the mechanics of health and accident insurance, the casualty insurance terms of "unearned premiums" and "unpaid losses" were added to the definition of a life insurance company in essentially the same language as that of the present § 801(a) of the Code. Unearned premiums are "those amounts which shall cover the cost of carrying the insurance risk for the period for which the premiums have been paid in advance." § 1.801–3(e) of the Regulations. The reserve for unpaid losses "represents the present value of all benefits not yet accrued at the date of valuation, arising from disabilities already incurred * * *"[6]. Commissioner of Internal Revenue v. Monarch Life Insurance Company, 114 F.2d 314, 322 (1st Cir. 1940). Thus, neither of these reserves cover the increased actuarial risks which accrue over the term of noncancellable policies, and an additional reserve must be maintained—a reserve similar to that maintained for level-payment straight-life insurance where "the factor for future premium deficiencies is an integral part of the actuarial tables on the basis of which the mortality reserve is computed." Alinco Life Insurance Company, supra, 373 F. 2d at 355, fn. 37. See also Massachusetts Protective Association v. United States, 114 F.2d 304, 309 (1st Cir. 1940); § 1.801–3(c) of the Regulations.

As a result of a comprehensive review of the taxation of life insurance compa-

---

5. Law of October 21, 1942, ch. 619, 56 Stat. 798.

6. For a more precise definition, see § 1.801–3(g) of the Regulations.

nies, Congress enacted the Life Insurance Company Income Tax Act of 1959.[7]

This Act added § 801(e) to the Code: "For purposes of this part, guaranteed renewable life, health, and accident insurance shall be treated in the same manner as noncancellable life, health, and accident insurance."

The Senate Finance Committee explained that this provision was to cover "life, health, and accident policies which are not cancellable by the company but under which the insurance company reserves the right to adjust premium rates by classes, in accordance with experience under the type of policy involved." S. Rep. No. 291, 86th Cong., 1st Sess. (1959–2 Cum.Bull. 770, 793). U.S.Code Cong. & Admin.News, p. 1606.

Group Life's Blue Shield plan provides medical and surgical benefits for employee groups. The contracts of insurance are between Group Life and various employers, with each employee member receiving a certificate indicating coverage. The policy may not be cancelled by Group Life, but the premium rate may be adjusted periodically, based on experience by class. This rate adjustment feature is a characteristic of a "guaranteed renewable" policy rather than a "noncancellable" policy (despite Group Life's name for the policy). The initial premium charged by Group Life was found by the District Court to remain level for two years, and the adjusted premium thereafter is to be guaranteed for at least two years.[8]

The Texas State Board of Insurance required that Group Life maintain reserves for unearned premiums and for unpaid losses for its guaranteed renewable contracts. No other reserves were required by the Board where a company had the right to adjust premium rates based on experience and by class. The Board considered Group Life's policy to be a "guaranteed renewable health and accident policy" for purposes of Texas law. While Congress has occasionally enacted Federal tax provisions which depend on underlying state definitions and thus result in varying treatment between taxpayers of the several states,[9] the life insurance company provisions of the Code evidence an intent that insurance companies be taxed uniformly. We consequently are required to determine what Congress meant by the term "guaranteed renewable" contracts.

▇ As set forth above, the history of special taxation of life, health, and accident insurance companies arose from their need to set aside as reserves a portion of premium and investment income in the early years of a policy to cover the cost of the risk in later years when the actuarial cost will be greater. *See* United Benefit Life Insurance Co. v. McCrory, 414 F.2d 928, 929–930 (8th Cir. 1969). This need to fund long-term actuarial risks was explicitly recognized as justifying the inclusion of noncancellable contracts. In providing that guaranteed renewable contracts should be treated in the same manner as noncancellable contracts, the Senate Finance Committee stated:

"Reserves with respect to such insurance will, therefore, be treated in the same manner as life insurance reserves for purposes of computing taxable investment income and gains from operations." S.Rep. No. 291,

---

7. 26 U.S.C.A. §§ 801–820.

8. The specimen policy supplied by Group Life as Stipulation Exhibit B, however, provides in Article IV. B. that "the Insurer reserves the right to change the schedule of premium rates on any policy anniversary, as applicable to the succeeding year." "Policy anniversary" is defined in turn by Article I. J. to mean "the month and day of any subsequent year corresponding to the policy date." The

discrepancy between these provisions and the finding by the District Court remains unexplained.

9. An example is the definition of legal relationships between husband and wife, especially with respect to community property versus common law treatment. *See e. g.*, Westfall, Revitalizing the Federal Estate and Gift Taxes, 83 Harv.L. Rev. 986, 998–1000 (1970).

86th Cong., 1st Sess. (1959–2 Cum. Bull. 770, 793).

In light of the prior history of this area of taxation and the fact that life insurance reserves are not treated in the same manner as unearned premium and unpaid loss reserves for income tax *computational purposes,*[10] it seems clear that Congress understood the reserves mentioned in the Senate Finance Committee Report to be in addition to unearned premium or unpaid loss reserves. The purpose of the reserves referred to in the Report is to cover the increasing cost of the insurance as the insured (individual or group) grows older. In contrast, the purpose of the periodic adjustment of premiums based on experience allowed under a guaranteed renewable policy is not to respond to an increase in the actuarial risks (which Group Life's REX formula[11] would do) but to cover

10. See *e. g.,* § 805(c). of the Code; Rev. Rul. 70–460, 1970 Int.Rev.Bull.No.36 at 8. *See generally* United States v. Atlas Life Insurance Co., 381 U.S. 233, 85 S.Ct. 1379, 14 L.Ed.2d 358 (1965).; Western National Life Insurance Co. of Texas v. Commissioner of Internal Revenue, 5 Cir., 1970, 432 F.2d 298 [No. 28569, Sept. 30, 1970)].

11. The REX formula is the revised rating formula used by Group Life to adjust the premiums on the basis of experience. The following description of its mechanics is taken from the Stipulation of the parties filed in the District Court:

"The Rex formula is a formula whereby the experience of each group (referred to as 'group experience') is combined with the experience of all groups subject to this formula (referred to as 'community experience'). The community experience is the combined experience of all groups rated under the Rex Formula for the past twelve months, and for the years involved herein was 83%. The relative weight of each group's experience to the community experience is based on the individual group's combined income for the preceding three years (referred to as 'credibility factor'). The Rex Formula is applied as follows:

A. Each group's cumulative three year premium income is determined and that amount is then used to determine the relative weight to be given to the group's experience by application of the following credibility table:

CREDIBILITY TABLE

| CUMULATIVE INCOME FOR LAST THREE YEARS | EXPERIENCE GROUP | RECOGNITION COMMUNITY |
|---|---|---|
| 0 — 3,999 | 20% | 80% |
| 4,000— 5,999 | 30% | 70% |
| 6,000— 8,999 | 40% | 60% |
| 9,000—12,999 | 50% | 50% |
| 13,000—17,999 | 60% | 40% |
| 18,000—23,999 | 70% | 30% |
| 24,000—30,000 | 80% | 20% |
| 31,000— up | 90% | 10% |

For example, a group with a total three year premium of $7,000.00 would use 40% of its group experience and 60% of the community experience in determining the increase or decrease in the premium rate.

B. The next step is to determine the experience factor for each group. This is computed by dividing the total claims paid by the total premium income for the past three years.

For example, a group having premium income of $7,000.00 and claims of $6,500.00 a year over a three years period has a group experience of 93%, ($6,500.00 ÷ $7,000.00).

C. The next step is to combine the group's own experience factor with the community experience factor in accordance with the credibility table as follows:

(1), Multiply the group's credibility factor times the group's experience factor. For example, a group having 40% credibility factor and a 93% experience factor has a resulting factor of 37.2%, (40% × 93%).

(2) Multiply the community's credibility factor times the community's experience

such factors as increased costs of medical care or an increase in the injury rate of a profession or trade. The Supreme Court has declared "that Treasury regulations must be sustained unless unreasonable and plainly inconsistent with the revenue statutes * * *". Commissioner of Internal Revenue v. South Texas Lumber Co., 333 U.S. 496, 501, 68 S.Ct. 695, 698, 92 L.Ed. 831 (1948). Treasury Regulation § 1.801–3(d) is neither "unreasonable" nor "plainly inconsistent" with § 801(e) of the Code, and must therefore be upheld.

The question remains, however, whether Group Life's policy in fact developed the additional reserves required by § 1.-801–3(d) of the Regulations. Although the parties stipulated in the District Court this question to be the sole disputed issue of fact, that Court made no finding of fact within Fed.R.Civ.P. 52(a) regarding it.[12] Because the District Court concluded as a matter of law that no additional reserves are needed by Group Life to qualify as a life insurance company, did not have to resolve the foregoing question of fact. Such conclusion of law, cannot survive the decision upholding the validity of the above Regulation. The District Court's finding that Group Life "establishes a premium rate which will remain level and not be increased for a long period of time" does not dispose of the question of an additional reserve because the earned premium income which is not a part of Group

Life's reserve for unpaid claims may be used for *any* purpose.

██ Group Life has not established the existence of the requisite reserve—a burden this taxpayer must carry to recover taxes alleged to have been erroneously collected. *E. g.* United States v. Anderson, 269 U.S. 422, 46 S.Ct. 131, 70 L.Ed. 347 (1926). No such reserve was reported in Group Life's annual financial statements, and Group Life's witnesses neither established the existence of nor the need for such reserve with respect to the policy here in question. Indeed, the Government's actuary testified this type of policy would not require an additional reserve, and one of Group Life's witnesses testified that only unearned premium and unpaid loss reserves were in fact maintained. Group Life's statistician did not testify to the contrary, as suggested by Group Life in its brief, but rather discussed only the computation of the initial premium, not the use to which the funds were put.

We do not agree with the argument that the Commissioner of Internal Revenue may not require a group life, health, and accident insurance company to maintain the extra reserve specified by § 1.801–3(d) of the Regulations in order to qualify as a "life insurance company for Federal tax purposes" because such company is not required by the State of Texas to maintain such a reserve. Section 801(b) (2) of the Code does not limit the definitional power of

factor. A community credibility factor of 60 times the community experience of 83% gives a resulting factor of 49.8% (60% × 83%).

(3) The group factor, 37.2%, is added to the community factor, 49.8%, and the result, 87.0%, is the adjusted three year ratio.

D. Reference is then made to the Rate Adjustment Table to determine whether the premium rate for the next policy year will remain the same, will be increased, or will be decreased. The rate adjustment table is as follows:

RATE ADJUSTMENT TABLE

| ADJUSTED RATIO | RATE ADJUSTMENT |
|---|---|
| Up to 59.9% | − 15% |
| 60% to 69.9% | − 10% |
| 70% to 82.9% | 0% |
| 83% to 90.9% | + 8% |
| 91% to 94.9% | + 12% |
| 95% to 98.9% | + 16% |
| 99% and up | + 20% |

For example, a group with a total adjusted three year ratio of 87% will have an increase in premiums of 8% over the previous year.

12. Group Life, unlike the United States, did not request the District Court to re-

the Commissioner, but on the contrary limits the reserves a company may claim as "life insurance reserves" for Federal income tax purposes. *See generally* Drummond Citizens Insurance Company v. United States, 298 F.Supp. 692 (E.D. Ark.1969).

We express no opinion concerning the wisdom of denying to Group Life the benefits of life insurance company classification for income tax purposes.[13] We must, however, conclude such treatment is foreclosed under existing law.

Accordingly, the judgment of the District Court is reversed.

## ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

PER CURIAM:

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.

solve this question in its "Proposed Findings of Fact and Conclusions of Law" filed in the District Court. Group Life requested only a finding that "An additional actuarially computed reserve based on recognized morbidity tables *could be* established for Taxpayers' [policy]" (emphasis added). The District Court did not adopt this proposed finding.

13. This Court stated in Western National Life Insurance Co. of Texas v. Commissioner of Internal Revenue, 432 F.2d 298, 302 (1970), that "very few phases of corporate or personal income taxation [have] been attended with as much difficulty as the devising of a fair basis for taxing insurance companies."