**SUPERIOR LIFE INSURANCE COMPANY, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 69–952.**

United States District Court, D. South Carolina, Florence Division.

Heard Nov. 18, 1970.

Decided Feb. 9, 1971.

George C. Evans, of Sinkler, Gibbs & Simons, Charleston, S. C., Willcox, Hardee, Houck, Palmer & O'Farrell, Florence, S. C., for plaintiff.

Joseph O. Rogers, Jr., U. S. Atty., D. S. C., Wistar D. Stuckey, Asst. U. S. Atty., Columbia, S. C., Johnnie M. Walters, Asst. Atty. Gen., and Hubert M. Doster, Dept. of Justice, Washington, D. C., for defendant.

HEMPHILL, District Judge.

Plaintiff institutes this suit for substantial tax refunds. The outcome is dependent upon whether the plaintiff qualifies as a "life insurance company" under Section 801 of the Internal Revenue Code of 1954.[1] If the plaintiff is entitled to be taxed as a life insurance company it is entitled to the relief sought.

Section 801, in defining life insurance companies, provides in part language pertinent to this consideration:

(a) Life insurance company defined.—For purposes of this subtitle, the term "life insurance company" means an insurance company which is engaged in the business of issuing life insurance and annuity contracts (either separately or combined with health and accident insurance), or noncancellable contracts of health and accident insurance, if—

(1) its life insurance reserves (as defined in subsection (b)), plus

(2) unearned premiums, and unpaid losses (whether or not ascertained), on noncancellable life, health, or accident policies not included in life insurance reserves,

comprise more than 50 percent of its total reserves (as defined in subsection (c)).

(b) Life insurance reserves defined.—

(1) In general.—For purposes of this part, the term "life insurance reserves" means amounts—

(A) which are computed or estimated on the basis of recognized mortality or morbidity tables and assumed rates of interest, and

(B) which are set aside to mature or liquidate, either by payment or reinsurance, future unaccrued claims arising from life insurance, annuity, and noncancellable health and accident insurance contracts (including life insurance or annuity contracts combined with noncancellable health and accident insurance) involving, at the time with respect to which the reserve is computed, life, health, or accident contingencies.

The threshold question to be resolved herein is whether the plaintiff company's qualifying reserves comprised more than 50 percent of its total reserves. As the position of the parties in that regard can be appreciated only after statement of the factual situation, orderly presentation requires a more particular discussion of the issues following a statement of the facts.

The factual situation is largely undisputed and was stipulated between the parties. The testimony taken at the hearing of the case dealt, in the main, with the inferences properly to be drawn from the stipulated facts. Pursuant to Rule 52, the facts, as they concern areas in dispute or are necessary to an understanding of the situation giving rise, to the controversy, are published as this court's

### FINDINGS OF FACT

(1) The plaintiff, for each of the taxable years in question, (1960–1964) time-

1. 26 U.S.C. § 801.

ly filed its income tax return and paid the amount of tax shown to be due thereon.

On September 11, 1968, the Internal Revenue Service made claim and demand upon the plaintiff for alleged federal income tax deficiencies, for the taxable years in question, in the aggregate amount of $96,515.44, which the plaintiff paid, together with interest thereon in the amount of $30,130.36, on September 20, 1968.

On September 23, 1968, plaintiff timely and duly filed claims for refund of the amount so paid on September 20, 1968.

On January 30, 1969, the District Director, Internal Revenue Service, Columbia, South Carolina, disallowed the plaintiff's claims for refund for each of the taxable years in question and gave plaintiff notice thereof by certified mail.

(2) The plaintiff, a South Carolina corporation, was engaged in the business of issuing contracts of credit insurance and was a wholly owned subsidiary of Stephenson Finance Company, Incorporated (hereinafter referred to as "Stephenson"), a South Carolina non-licensed small loan company.

The insurance sold by the plaintiff was primarily sold through Stephenson and through other finance companies related to Stephenson and to the plaintiff, although a small amount of insurance was sold through finance companies unrelated to Stephenson or to the plaintiff.

(3) The insurance sold by the plaintiff is known generally as "credit life, accident and health insurance." Credit life, accident and health insurance is term insurance on the lives of debtors, with the creditors of the insured debtor as beneficiary. The amount payable, under these policies, on the death of an insured debtor is an amount at least sufficient to discharge the debtor's indebtedness. The amount payable, under these policies, in the event of total and permanent disability is an amount at least sufficient to meet the installment payments on the debtor's indebtedness as they mature,

during the period of total and permanent disability. Ordinarily, credit life, accident and health insurance is sold as a part of another, and more prominent transaction, namely, a loan of money or an installment sale of tangible personal property, such as an automobile. These policies may be written either (i) as an individual policy issued directly to the insured debtor, or (ii) as a group policy covering the lives of debtors of Stephenson, in which event the individual debtors of Stephenson receive certificates of insurance evidencing coverage under the group policy.

The insurance sold through Stephenson was accomplished through the medium of a group credit life, accident and health insurance policy, which combined features of life, accident and health insurance (hereinafter referred to as the "Group Policy"), under the terms of which, Stephenson was authorized to sell coverage to its borrowers, their coverage under the Group Policy being evidenced by a certificate of insurance (hereinafter referred to as the "Certificate of Insurance"), issued thereunder. Under the terms of the Group Policy, the plaintiff was liable to satisfy the obligation of the debtor, in the event of his death or disability, any excess being paid to the debtor or his personal representative.

(4) A Certificate of Insurance issued to a borrower of Stephenson ordinarily was in the face amount and for the duration of the loan, which extended for a maximum period of three years. Each Certificate of Insurance provided the debtors of Stephenson with life, accident and health coverage.

The Group Policy provided that (i) the premium for the life insurance coverage afforded with respect to each Certificate of Insurance was payable by Stephenson to the plaintiff in a single premium on the first day of the month immediately following the month in which the Certificate of Insurance was issued, and (ii) the premium for the accident and health coverage afforded with respect to each Certificate of Insurance was payable by Stephenson to the plaintiff on the first

day of each month, on an earned premium basis, during the term of the Certificate of Insurance.

The Group Policy further provided that it was not cancellable by the plaintiff but could be terminated at any time by Stephenson. In the event the Group Policy was cancelled by Stephenson, it provided that any Certificates of Insurance, which had been issued under the Group Policy prior to the date of such cancellation would remain in full force and effect until the earlier of (i) the discharge of the indebtedness, (ii) the assignment of the indebtedness, or (iii) the default by the debtor and the succession of another to his rights. Although an insured debtor could not cancel a Certificate of Insurance, he could, by prepayment of or default in the indebtedness, automatically effect its termination.

(5) The mechanics of the sale of coverage under the Group Policy and the issuance of a Certificate of Insurance were, as follows: When an individual borrowed money from Stephenson, he was offered the opportunity, by the Stephenson employee making the loan, to obtain coverage under the Group Policy. If the borrower desired to obtain coverage under the Group Policy, the amount of the loan from Stephenson to the borrower was increased by an amount sufficient to pay, for the entire term of the policy, (i) the life insurance premium and (ii) the accident and health insurance premiums. The amount of the insurance premiums was treated as part of the loan and the principal amount of the note of the borrower to Stephenson included this amount as principal, with interest being charged thereon. The proceeds of the loan which the borrower received, did not, however, include any portion of the insurance premiums, but rather, the entire amount of the insurance premiums was withheld by Stephenson from the proceeds of the loan and retained by it as a reserve for premiums to become due with respect to the Certificate of Insurance so issued. The amount retained by Stephenson was carried on the books of Stephenson as a liability entitled "Reserve for A & H Premiums." The amount so withheld is referred to hereinafter as the "liability account."

Stephenson, as provided under the terms of the Group Policy, on the first day of the month immediately following the month in which a Certificate of Insurance was issued, paid to the plaintiff, from the amount retained, (i) in a single premium, the life insurance premium due for the entire term of the Certificate of Insurance so issued, and (ii) one month's premium on the accident and health coverage afforded by the Certificate of Insurance so issued. Thereafter, with respect to such Certificate of Insurance, Stephenson, on the first day of each month during its term, paid to the plaintiff an additional one month's premium for the accident and health coverage afforded by such Certificate of Insurance. In the event of cancellation by the debtor either as a result of prepayment or default by him the A & H premiums held by Stephenson were credited against his indebtedness.

(6) The plaintiff maintained reserves on all Certificates of Insurance issued under the Group Policy. With respect to the life insurance coverage afforded by each Certificate of Insurance, the plaintiff maintained morbidity or morality reserves in accordance with the "Commissioner's 1941 Standard Ordinary Table of Mortality." With respect to the accident and health insurance coverage afforded by each Certificate of Insurance, the plaintiff maintained gross unearned premium reserves, under which a portion (50%) of the gross amount of each accident and health premium was reserved until the period of risk had expired, the expiration of which occurred on the immediately succeeding premium due date. The plaintiff maintained no insurance reserves with respect to the "liability for accident and health premiums to become due" held by Stephenson. With respect to each of the taxable years in question, the plaintiff's insurance reserves, on all policies of insurance issued by it, at the end of each of its taxable

years (December 31), as set forth on its annual statement, and the "liability for accident and health premiums to become due" maintained on Stephenson's books, at the end of each of its taxable years (December 31), for premiums to become due with respect to the accident and health coverage afforded by the Certificates of Insurance so issued were, as follows:

### Superior Life Insurance Company

| Year | Life Reserves (Morbidity) | Accident & Health (Unearned Premiums) |
|------|---------------------------|----------------------------------------|
| 1960 | 93,546.67 | $ 61,667.24 |
| 1961 | 105,417.26 | 68,478.16 |
| 1962 | 159,774.98 | 115,815.69 |
| 1963 | 223,149.38 | 126,468.61 |
| 1964 | 300,668.31 | 184,761.56 |

### Stephenson Finance Company, Incorporated

| Year | Liability for Accident & Health Premiums to Become Due |
|------|--------------------------------------------------------|
| 1960 | 93,864.29 |
| 1961 | 87,538.58 |
| 1962 | 91,296.34 |
| 1963 | 121,390.82 |
| 1964 | 214,209.67 |

(7) In most forms of insurance (other than life insurance), the policyholder pays the premium for protection during a comparatively short term against loss through a contingency which may never occur and which is only slightly more likely to occur during each succeeding term of the policy than during the term for which the premium is paid. With respect to life insurance, on the other hand, the event insured against is certain to occur and the probability of its occurrence increases with each year of the insured's life. Thus, in the early years of a life insurance policy, the premiums are sufficient to provide for not only the cost of the insurance protection during the earlier years, but also an amount to be invested and accumulated at interest to provide for insurance protection in future years. This investment fund, generally called the reserve on the policy, is the basic life insurance reserve. These basic life insurance reserves are known generally as mortality or morbidity reserves and are computed or estimated on an actuarial basis which takes into account life expectancy and assumes a given rate of interest.

(8) The original forms of accident and health insurance and today's commercial (cancellable) forms of accident and health insurance come within the category of insurance against a risk or contingency which may never occur and the likelihood of the occurrence of which does not substantially increase with the age of the insured. With respect to such accident and health insurance, there is maintained an unearned premium reserve, a portion of which is maintained for the risk insured against (the morbidity reserve) and the remainder of which was historically required to augment the morbidity reserve in the event of a refund to the policyholder upon his cancellation of the coverage, and a reserve for unpaid losses and claims. The unearned premium reserve consists of those portions (averaging 50%) of gross premiums for the current period of the policy received on policies which the insurance company sets aside in the form of a reserve to cover the unexpired portion of the terms of such policies. As distinguished from an unearned premium, an "advance premium" is a premium paid by an insured prior to the due date provided by the insurance policy for the payment of such premium. Advance premiums are not insurance reserves and are, in a sense, similar to a bank deposit in the hands of the insurance company that becomes available for the future payment of premiums when the due date for the payment thereof falls due.

The reserves for unpaid losses and claims are the amount of accrued claims, which are due but have not been paid. (9) The reserves maintained by the plaintiff with respect to the life insurance element of the Certificates of Insurance issued through Stephenson (which combined features of life, accident and health coverage), together with the reserves maintained with respect to the life insurance element of all other contracts issued by the plaintiff, qualify under Section 801(b) of the Internal Revenue Code of 1954 as life insurance

reserves, the amount thereof, for each of the taxable years in question, being set forth under the column entitled "Life Reserves (Morbidity)" in paragraph (6) hereof.

(10) Accident and health insurance premiums, like all insurance premiums, consist of two elements: (i) the pure insurance cost, which, in the case of accident and health insurance, is the morbidity element, and (ii) the loading or amount in addition to the pure insurance cost, which is the portion of the premium, which, it is anticipated, will provide for administrative costs, expenses and a profit for the insurance company.

The insurance cost incurred by Superior in carrying the accident and health insurance risk with respect to all policies issued by it, was 32% of its gross unearned premium reserves and 32% of the liability account.

(11) As in the case of finance companies generally, it was advantageous to Stephenson to retain, for as long a period as possible, the accident and health insurance premiums because it would result in the reduction of Stephenson's borrowing costs. On the other hand, it would have been advantageous to Superior, as in the case of insurance companies generally, to receive the insurance premiums on policies issued by it as soon as possible because the premiums could have been invested by Superior. Thus, there is a natural conflict of interest, with respect to payment and receipt of insurance premiums, between the finance company, on the one hand, and the insurance company, on the other. The Group Policy was an outgrowth of this natural conflict of interest and represented an arms' length agreement, even though between related taxpayers. The amount of the premium charged by Superior was standard in the credit insurance industry for this type policy; and the arrangement was authorized by the statutes of South Carolina and approved by the South Carolina Insurance Department.

(12) With respect to each of the taxable years in question, the Internal Revenue Service has determined that the plaintiff did not qualify as a life insurance company under Section 801 of the Internal Revenue Code 1954. This determination has been made upon the basis that the said liability, carried on Stephenson's books, is, in fact, an unearned premium reserve of the plaintiff. It is contended that the Group Policy, and the Certificates of Insurance issued thereunder, are not noncancellable life, health or accident policies within the meaning of Section 801(b) of the Internal Revenue Code of 1954 and, as such, the plaintiff is not a life insurance company within the meaning of said Section 801. This result is obtained through the defendant's contention that the unearned premium reserves carried by the plaintiff, together with the "liability for accident and health premiums to become due" carried by Stephenson do not constitute reserves with respect to policies of life insurance so that the plaintiff's life insurance reserves do not comprise more than 50% of its total insurance reserves, as is required by said Section 801 in order for an insurance company to qualify as a life insurance company thereunder. Based upon the foregoing, the Internal Revenue Service has determined that the plaintiff is subject to tax under Sections 831 and 832 of the Internal Revenue Code of 1954, and not Section 802 thereof, pursuant to which the plaintiff computed its taxable income and tax on the premise that it qualified as a life insurance company under said Section 801.

## DISCUSSION OF ISSUES

The questions posed in the controversy are stated by the parties as follows:

(a) The defendant has determined that the liability "Reserve for unearned A & H Premiums" which was carried by Stephenson on its books, was, in fact properly reportable by the plaintiff. Was such determination correct?

(b) Assuming the answer to (a) is in the affirmative, is the amount so reportable to be considered as part of the

unearned premium reserve of the plaintiff, or is it an "advance premium," and therefore, not an insurance reserve?

(c) Assuming the answer to paragraph (a) is in the affirmative and that the amount so reportable is to be considered part of the unearned premium reserve of the plaintiff, does the plaintiff qualify as a life insurance company under the provisions of Section 801 of the Internal Revenue Code of 1954?

It is agreed that if the issue presented in subparagraph (a) is decided in the negative, or if the issue presented in subparagraph (b) is decided on the basis that the amount so reportable is an advance premium, the plaintiff will, for each of the taxable years in question, qualify as a life insurance company under the provisions of Section 801 of the Internal Revenue Code of 1954.

With respect to the third issue, the government contends that, because of the allocation of the Liability Account, and its classification as a gross unearned premium reserve, Superior fails to qualify as a life insurance company under the provisions of section 801 as its life insurance reserves do not comprise more than 50% of its total insurance reserves. Superior contends that, even if it loses the first and second issues, its life insurance reserves would, nonetheless, comprise more than 50% of its total insurance reserves, and therefore, it would qualify as a life insurance company under section 801. Superior's contention on the third issue rests on three alternative grounds, which are, as follows:

(1) All reserves maintained by it (the mortality reserves, the reserves on accident and health insurance and the Liability Account upon allocation), qualify as life insurance reserves under section 801 because these reserves are maintained with respect to "life insurance * * * contracts * * * combined with health and accident insurance;"

(2) Its unearned premium reserves (including the Liability Account, if allocated, would consist not of the gross unearned premium reserves, but rather, of

an amount equal to Superior's "cost of carrying the insurance risk," which the plaintiff's expert witness, Arthur C. Eddy, testified to be 32% of Superior's gross unearned premium reserves and 32% of the Liability Account); or

(3) The insurance policies issued by it were noncancellable, and all of its insurance reserves (including the Liability Account, if allocated) therefore, qualify as life insurance reserves.

The first two issues in this case involve primarily factual determinations, as the government contends that a contractual arrangement (the Group Policy) entered into between Superior and Stephenson should be disregarded for federal income tax purposes. Although there is a wealth of case material in this area, it is generally unenlightening except in the context of the particular facts of each individual case, which the courts have often noted. (See, e. g., Alinco Life Insurance Company v. United States, 373 F.2d 336, 341, 178 Ct.Cl. 813 (1967).) The third issue in this case involves primarily a legal determination in an area of great complexity and in which there is surprisingly little case law.

## CONCLUSIONS OF LAW

Jurisdiction is vested in this court under section 1346(a) (1) of Title 28, United States Code.

### (1) *The First Issue.*

With respect to the first issue presented in this case, the government makes three primary contentions in its efforts to include the Liability Account on the books of account of Superior, viz., (i) that the contractual arrangement between Superior and Stephenson (the Group Policy) should not, for federal income tax purposes, be given effect, and instead the substance or "practical effect" of this arrangement should control; (ii) that, under the doctrine of "constructive receipt," Superior should be deemed to have received the accident and health premiums because its right to receive the same had been fixed; and (iii) that, under section 482, the Liabil-

ity Account is properly allocable from Stephenson to Superior.

A. The contention of the government that the Group Policy should be disregarded falls within the ambit of the decision of the United States Supreme Court in the case of Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935), and its doctrine that transactions heavily laden with tax avoidance motives are not to be given effect for tax purposes.

The *Gregory* case (and its progeny) stands for the general proposition that a transaction effected for the principal purpose of tax avoidance (or the tax benefit to be derived therefrom), is not given the favorable tax result sought, but this doctrine does not, however, extend to a situation in which taxpayers, engaged in business transactions, seek, by careful tax planning, to reduce, or to avoid altogether, Federal Income Taxes. (See, e. g. Maxwell Hardware Co. v. Commissioner, 343 F.2d 713 (9th Cir. 1965) and Commissioner of Internal Revenue v. Newman, 159 F.2d 848 (2nd Cir. 1947).) In other words, a taxpayer, who embarks on a course of conduct for the primary purpose of effecting a desired tax result, as opposed to achieving a desired business result, would be prevented by the doctrine of the *Gregory* case from achieving the desired tax result. On the other hand, a taxpayer, who embarks on a course of conduct for the primary purpose of achieving a desired business result, may carefully plan his actions in such a manner as to reduce, or to eliminate entirely, Federal Income Taxes. (A. P. Green Export Co. v. United States, 284 F.2d 383 (Ct.Cl., 1960)). Indeed, even a "major motive" to reduce or avoid taxes will not vitiate an otherwise valid and real business transaction. (United States v. Cumberland Public Service Co., 338 U.S. 451, 70 S.Ct. 280, 94 L.Ed. 251 (1950)).

Basically, the government's contention is that the Group Policy was cast in the manner in which it was to make certain Superior qualified under section 801 as a life insurance company. Assuming arguendo that the government is correct in this contention, the Group Policy still could not be disregarded by the court. Superior, in issuing the Group Policy, was engaged in the business most basic to it and for which it was created and existed, namely, the issuance and sale of credit insurance. A desire by Superior to reduce or avoid federal income taxes in the normal conduct of its business, the issuance and sale of credit insurance, would be not merely a legitimate consideration, but rather a mandatory one if good business practice were to be followed. (*Cumberland, Maxwell Hardware Co., A. P. Green Export Co.*, supra.)

In addition, the government has argued that the Group Policy should be regarded, not as a three-party transaction, but rather, as a transaction involving only two parties (the debtor of Stephenson and Superior), and that, as such, the practical effect of the transaction was that the accident and health insurance premium was paid in a lump sum upon the issuance of a Certificate of Insurance. The government fails to recognize that Superior did not control the relationship between Stephenson and its debtors and the manner in which they conducted their affairs. The Group Policy provided that Stephenson (the policyholder, and not the debtors of Stephenson) was to pay to Superior all insurance premiums thereon, and contained no provision whatever relative to the loan transaction between the insured debtor and Stephenson. It is not disputed that Superior was a wholly owned subsidiary of Stephenson, but this fact does not give rise to a presumption that its arrangements with each other were illegal (Sun Properties, Inc. v. United States, 220 F.2d 171 (5th Cir. 1955)) and certainly no presumption would arise whereby it would be assumed that the wholly owned subsidiary (Superior) controlled the parent (Stephenson) and its method of doing business. Moreover, this contention involves the more basic position of the government, under the *Gregory* case, that the Group Policy should be disregarded

for federal income tax purposes, which this court, under the facts of this case, is simply not at liberty to do.

B. The second contention of the government on the first issue is stated in terms of "constructive receipt." The Income Tax Regulations, under section 451, provide that in order for the doctrine of constructive receipt to be applicable: (i) income must be set apart for the account of the taxpayer and (ii) with respect to such income, the taxpayer must have the right to withdraw (or to use) such income upon demand. (Regs., § 1.451–2.) Although Stephenson set apart funds for the payment of the accident and health premiums (the Liability Account), Superior had no right to withdraw or to use such funds until the due date specified in the Group Policy for the payment thereof. The Group Policy provided that Stephenson would refund the accident and health premium to the debtor in the event of a default by the debtor on his indebtedness or in the event of his prepayment of his indebtedness (the refund usually coming in the form of a credit against the debtor's indebtedness to Stephenson), without, in either instance, any benefit to Superior. Superior, under the terms of the Group Policy, had no right to receive the accident and health premiums from Stephenson unless the indebtedness of the debtor to Stephenson remained outstanding at the due date for the payment of the premium.

Although the government has cast this argument in terms of constructive receipt, it is more akin to the anticipatory assignment of income cases. (See, e. g., Helvering v. Horst, 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75 (1940).) In its brief, the government states:

The fact that the plaintiff may have contracted away its right to receive the total premiums immediately cannot logically be argued to alter the fact that the premiums were the plaintiff's income at the time they were paid by the insured.

The basic flaw of the government's approach is that it is based upon the assumption that Superior, prior to its even having entered into a contract with Stephenson (the Group Policy), had a right to receive the accident and health premiums in a lump sum, and that by entering into the Group Policy, Superior relinquished this right. On the contrary, Superior relinquished no rights by entering into the Group Policy with Stephenson, rather, Superior's rights were established by the Group Policy, and it is from this contractual arrangement that any rights Superior had were derived. It is as though the government has assumed that Superior, upon its incorporation, was thereupon vested with the inalienable right to demand all finance companies with which it did business, to pay all insurance premiums on a single-premium basis at the inception of each policy, an assumption which belies reality.

The assignment of income cases, such as *Horst*, involve taxpayers who attempt to rid themselves of income after having entered into the contract (the bond in the *Horst* case) establishing their right to income. In the instant case, there was no attempt on the part of Superior or Stephenson to get rid of income, as no one disputes that the accident and health premiums were paid by Stephenson to Superior in accordance with the terms of the Group Policy.

The government cites the case of Commissioner of Internal Revenue v. Hansen, 360 U.S. 446, 79 S.Ct. 1270, 3 L.Ed.2d 1360 (1959), as supporting its position relative to the doctrine of constructive receipt, and at page 7 of its brief, cites the *Hansen* case as one in which this doctrine was applied "even though [the taxpayer] might not have a present right to withdraw [the funds]." [2] A reading of the *Hansen* case clearly shows that it stands for the proposition that a taxpayer's method of accounting must clearly reflect his income, and that an accrual basis taxpayer is taxed on income when his right to receive such income (or the

2. Government's brief, page 7.

benefit thereof) has been fixed. The *Hansen* case is inapposite to the instant case. In *Hansen,* the taxpayer's right to receive the income (the funds withheld by the finance company in the taxpayer's reserve account) was fixed upon the sale of the debtor's promissory note by the taxpayer to the finance company as, regardless of the occurrence of any other event, the taxpayer would receive either (i) a cash payment representing the funds set aside in the reserve account, if there were no default by the debtor, or (ii) the benefit of those funds in the event of the debtor's default, as, in the event of the debtor's default, those funds would be used to satisfy the taxpayer's liability on his endorsement of the debtor's promissory note. (360 U.S. at pp. 465–466, 79 S.Ct. 1270.) Thus, in *Hansen,* from the moment of the sale of the debtor's note by the taxpayer to the finance company, the taxpayer had a fixed right to the funds retained by the finance company, as those funds were irrevocably committed to the use, or benefit, of the taxpayer. In the instant case, unlike *Hansen,* the funds in the Liability Account were not committed to Superior's benefit as Superior had no right to such funds unless the debtor's obligation to Stephenson remained outstanding on the next due date for the payment of the premiums. Under the terms of the Group Policy if a debtor defaulted in his obligation to Stephenson, or prepaid his indebtedness, so that his obligation was no longer outstanding, the accident and health premiums were either refunded to the debtor (or applied for the debtor's benefit) without Superior's receiving any benefit therefrom.

■ C. The government cites section 482 as authority for allocating to Superior, the Liability Account carried by Stephenson. The section is generally held to apply in order to place related taxpayers on a tax parity with unrelated taxpayers (Simon J. Murphy Co. v. Commissioner, 231 F.2d 639 (6th Cir. 1956)), and the regulations so provide. (Regs. § 1.482–1(b) (1).) In the instant case, the Group Policy was not unusual in the credit insurance industry, was an arms' length business arrangement, was authorized by the statutes of South Carolina (§ 37–305,[3] South Carolina Code of

---

3. Section 37–305, S.C.Code of Laws, 1962, provides: Same; issued to creditor on debtors.—Such a policy may be one issued to a creditor, who shall be deemed the policyholder, to insure debtors of the creditor, subject to the following requirements;

(1) The debtors eligible for insurance under the policy shall be all of the debtors of the creditor whose indebtedness is repayable in installments or all of any class or classes thereof determined by conditions pertaining to the indebtedness or to the purchase giving rise to the indebtedness. The policy may provide that the term "debtors" shall include the debtors of one or more subsidiary corporations and the debtors of one or more affiliated corporations, proprietors or partnerships if the business of the policyholder and of such affiliated corporations, proprietors or partnerships is under common control through stock ownership, contract or otherwise.

(2) The premium for the policy shall be paid by the policyholder, either from the creditor's funds or from charges collected from the insured debtors, or from both. A policy on which part or all of the premium is to be derived from the collec-

tion from the insured debtors of identifiable charges not required of uninsured debtors shall not include, in the class or classes of debtors eligible for insurance, debtors under obligations outstanding at its date of issue without evidence of individual insurability unless at least seventy-five per cent of the then eligible debtors elect to pay the required charges. A policy on which no part of the premium is to be derived from the collection of such identifiable charges must insure all eligible debtors or all except any as to whom evidence of individual insurability is not satisfactory to the insurer.

(3) The policy may be issued only if the group of eligible debtors is then receiving new entrants at the rate of at least one hundred persons yearly, or may reasonably be expected to receive at least one hundred new entrants during the first policy year, and only if the policy reserves to the insurer the right to require evidence of individual insurability if less than seventy-five per cent of the new entrants become insured.

(4) The amounts of insurance on the life of any debtor shall at no time exceed the amount of the orginal loan.

Laws, 1962), was approved by the South Carolina Insurance Department, and was the result of the natural conflict of interest existing between Superior and Stephenson, relative to the payment and receipt of the insurance premiums. Under such circumstances, section 482 may not be applied.

The government has raised the question of whether Superior, as an accrual basis taxpayer, should have included the Liability Account on its books. Its cross examination of Superior's accounting expert shows the government is contending that, because Stephenson showed the full amount of the Liability Account as a current account payable in its financial statements as of August 31, 1963, Superior, as an accrual basis taxpayer, should have shown the full amount of the Liability Account as an account receivable on its books.

■ In the discussion relative to the *Hansen* case, the regulation and the case law provide that an accrual basis taxpayer includes an item in income when his right to receive such income (or the benefit thereof) has been fixed, and not before. (*Hansen*, supra, and Regs. § 1.-446–1(c) (1) (ii).) Superior, unlike the taxpayers in the *Hansen* case, had no fixed right to the funds in the Liability Account as those funds were subject to being refunded to Stephenson's debtors (or applied for their benefit) in the event a debtor prepaid his obligation, or defaulted thereon. Until the due date specified in the Group Policy for the payment of the accident and health premium was reached, Superior had no right to

such funds. The fact that Stephenson accrued the Liability Account as an account payable is irrelevant to the determination of the proper accounting procedure to be followed by Superior. Although Stephenson showed the Liability Account as an account payable,[4] Stephenson, under the terms of the Group Policy (the refund provisions) could not properly have shown it to be in favor of Superior, and, at no point in the record of this case does it appear that Stephenson carried the Liability Account as an account in favor of Superior.

With respect to the first issue, the court concludes that the Group Policy was a valid and real business arrangement and not to be disregarded for federal income tax purposes, and further, that the Liability Account was properly carried by Stephenson on its books, and therefore, not properly allocable to Superior. Therefore, Superior qualified as a life insurance company under section 801 for each of the taxable years in question and is entitled to the relief prayed for in its Complaint as its life insurance reserves, in each of such years, comprised more than 50% of its total insurance reserves.

For these reasons the liability "Reserve for Unearned A & H Premiums" which was carried by Stephenson on its books was properly reported by Stephenson and not reportable to plaintiff.

This conclusion on the first issue raised is sufficient to resolve the controversy herein. However, because of the importance of the question to the government and the credit insurance in-

---

(5) The insurance shall be payable to the policyholder. Such payment shall reduce or extinguish the unpaid indebtedness of the debtor to the extent of such payment.

4. Superior could not carry the premiums not yet due as a receivable, because it was not due Superior until a sufficient indebtedness-period (time) had run for the right to payment to arise in Superior, Superior was not a creditor until the time arrived for the premium to be remitted by Stephenson. If the time never arrived there was no debt due. "Accounts Re-

ceivable" are contract obligations owing to a person on open account. West Virginia Pulp & Paper Co. v. Karnes, 137 Va. 714, 120 S.E. 321, 322. An account receivable has also been defined as "the right to receive payment of a debt which ultimately must be done by act of the debtor". Boulevard Nat. Bank of Miami v. Air Metal Industries, Inc., Fla., 176 So.2d 94, 98. Actually the borrower could carry the unused balance as a receivable so long as he kept up payments if he accelerated and paid up, he would get credit or refund.

dustry and the consequent likelihood of appeal from this order the court considers it in the best interest of judicial administration to consider and determine the remaining two issues raised by the parties. By so doing the possibility of remand or further litigation may be reduced.

(2) *The Second Issue.*

█ If the liability account was properly reportable by Superior did it constitute unearned premium reserve or was it advance premium and therefore not an insurance reserve? In Revenue Ruling 69–270, the Internal Revenue Service, in distinguishing an unearned premium from an advance premium, stated:

> Unearned premiums, as defined in section 1.801–3(e) of the Regulations are those amounts that cover the cost of carrying the insurance risk proportionate to the unexpired period of the policy term, the coverage of which began on a premium due date that is already past. *On the other hand, advance premiums are amounts that have been received but are not yet due.* [Emphasis added.]

The regulations under section 801 indicate that an advance premium is not an insurance reserve and, as such, would not be included in the insurance reserves of an insurance company for the purpose of determining whether such company qualified as a life insurance company under section 801. (Regs. § 1.801–4(e) (6), § 1.801–5.)

In considering this issue, it is necessary to bear in mind that it is reached only if the government, contrary to the above stated conclusion of this court, prevails in its argument that funds held by Stephenson are properly attributable to Superior. Should the government prevail upon the first issue, it would likewise prevail upon the second.

As the premiums, under the terms of the group policy, are due Superior only on a monthly basis, there would seem to be merit in Superior's argument that if the total premium may be allocated to it

when paid by the borrower it would constitute advance rather than unearned premiums. However, the argument fails to take into account the fact that the policy provision establishing the monthly payment of the premiums must be disregarded to reach the question. If that provision may for tax purposes be disregarded, there can be no question that the total premium paid by the borrower constitutes unearned rather than advanced premiums.

Under the arrangement in question the total premium must be paid by the borrower to Stephenson at the time he receives the loan and the benefit of the policy. There is no question but that Stephenson required the entire premium paid in advance. If that payment, though held by Stephenson and under the terms of the contract due Superior only on a monthly basis, is reportable by Superior it constitutes an unearned premium. If the terms of the contract do not prevent the allocation of the receipts of Stephenson to Superior, it cannot be said that they convert a payment inarguably due Stephenson from the borrower into an advance to Superior.

(3) *The Third Issue.*

> (I) Do all of Superior's reserves qualify as life insurance reserves because maintained on "life insurance * * * contracts * * * combined with health and accident insurance?"

Section 801(a) which defines the term "life insurance company" for federal income tax purposes, provides, in pertinent part, that a life insurance company is:

> an insurance company which is engaged in the business of *issuing life insurance * * * contracts (either separately or combined with health and accident insurance)*, or noncancellable contracts of health and accident insurance, if * * * its life insurance reserves * * * comprise more than 50 percent of its total reserves * * * [Emphasis added.]

A short review of some of the pertinent history of life insurance company taxation is necessary for proper consideration of the contentions of the parties in this regard. Under the Revenue Act of 1921, life insurance companies, because of the long-term aspect of reserve requirements, were not taxed on premium income and, instead, were taxed only on investment income, such as interest, dividends, and the like. (Revenue Act of 1921, § 244.) Additionally, life insurance companies were allowed a deduction, based on an assumed rate of interest (4% in the 1921 Act, but varied in subsequent Acts), on all of its technical insurance reserves, regardless of whether the reserves were maintained on life insurance, accident and health insurance, or casualty insurance. (Revenue Act of 1921, § 245.) The important factor was the initial determination of whether the insurance company qualified as a life insurance company. In contrast to the treatment of life insurance companies by the Revenue Act of 1921, non-life insurance companies were taxed on premiums upon receipt and were not allowed a deduction for interest on reserves. (Revenue Act of 1921, § 246.) The practical effect of the reserve interest deduction being treated in this manner was that a life insurance company issuing a non-life insurance policy (for example, a separately issued policy of cancellable accident and health insurance) received different treatment on the reserve interest deduction—the life insurance company being allowed an interest deduction on the reserves it maintained on such policies, but the non-life insurance company was not allowed this deduction.

After 1921 it appeared that because of the similarity to life insurance with respect to reserve requirements, insurance companies issuing policies of noncancellable health and accident insurance should be afforded life insurance company status.[5] The Revenue Act of 1942,

as it pertains to life insurance companies, was an effort to afford life insurance status to companies issuing noncancellable accident and health policies because of the analogous reserve requirements.

In the Group Life and Health Ins. Co. v. United States, 434 F.2d 115 (5th Cir. 1970), in discussing the Revenue Act of 1942, the court stated:

Defining insurance companies in terms of their reserves for tax purposes next led Congress to recognize that 'noncancellable' health and accident policies ought to be treated similarly to life policies. * * * The Revenue Act of 1942, therefore, *expanded the class of corporations taxable as life insurance companies to include those issuing noncancellable health and accident policies.* [Emphasis added.] 434 F.2d at 117.

The Court of Claims in Alinco Life Insurance Co. v. United States, 373 F.2d 336, 178 Ct.Cl. 813 (1967), in discussing the Revenue Act of 1942, stated:

Thus, for the first time there was included in the definition of a life insurance company the casualty insurance terms 'unearned premiums,' 'unpaid losses,' and 'noncancellable.' It is entirely clear that this was done only because the formula was being reshaped to take into account reserves on noncancellable health and accident policies which were reserved on an unearned premium and unpaid loss basis. The legislative history indicates no other purpose for the use of these casualty terms and, particularly, no intent to change the preexisting definition as it applied to a life insurance company writing only life insurance * * *. (373 F.2d at p. 348)

In 1954, Congress adopted, without change, the life insurance company definitional provisions of the Revenue Act of 1942, which appeared as section 801 of the Internal Revenue Code of 1954.

---

5. Alinco Life Ins. Co. v. United States, 373 F.2d 336, 347–348, 178 Ct.Cl. 813 (1967) and reports of Senate Committee on Finance therein cited.

In 1959, the entire area of the taxation of insurance companies, both life and non-life, was extensively reviewed by Congress. The legislative history of the Life Insurance Company Income Tax Act of 1959 shows that Congress, in its deliberations, considered credit life insurance companies, such as Superior, and the recent trend of life insurance companies to issue short-term policies. Arguing for a revision of the life insurance company taxing formula, Undersecretary of the Treasury, Fred C. Scribner, stated (Hearings before the Sub-Committee on Internal Revenue Taxation of the Committee on Ways and Means, House of Representatives, 85th Cong., 2d Sess., November 17–20, 1958, p. 17):

> It is true that formulas adopted for the taxation of life insurance companies since 1921 have taken investment income as a measurement of the tax base. However, at the time the 1921 law was enacted, the life insurance business was much more homogeneous than it is today. Such business as group pension insurance, group insurance generally, *credit insurance,* and accident and health insurance were not major income producers for life insurance companies.

> While there were even then shortcomings in the investment income approach, it could be justified under those conditions. Now large and increased amounts of insurance are being sold with substantial underwriting profits, which, however, produce relatively little investment income. While major reliance may still be placed on the traditional investment income base, *under present conditions and trends* other sources of income, such as gain from underwriting and capital gains, should not be ignored. [Emphasis added.]

In the 1959 Act Congress, in seeking a method of solving the problems created by life insurance companies issuing accident and health insurance policies and insurance policies of short duration, chose not to exclude such companies from life insurance company status by changing the definition of what constitutes a life insurance company from that contained in Sections 242 and 201(b) respectively of the Revenue Acts of 1921 and 1942. Instead, Congress chose to subject the premium income of life insurance companies to taxation. Congress reasoned that the primary factor in granting immunity from taxation to the premium income of life insurance companies (the long term reserve requirements) was no longer present due to the trend to policies of short duration and the growth of credit insurance companies. In addition to providing a tax on premium income, Congress also included a method (Phase III) of taxing premium income on a basis whereby the duration of the policy is of prime importance in determining when premium income, deferred under Phase II, becomes subject to taxation. Under Phase III, the shorter the duration of the policies issued by a life insurance company the more rapidly the premium income deferred under Phase II, becomes subject to taxation, because, quite naturally, the determination of whether an underwriting gain or loss has occurred is determinable at an earlier point in time. When viewed in this light, the 1959 Act represents a clear expression of Congressional intent. Congress chose in 1959 (as it had in 1942), to subject more of the income of these life insurance companies (such as Superior) to taxation, and not, as the government urges, to exclude such companies from life insurance company status.

Superior's contention is that as it issues only "life insurance contracts combined with health and accident insurance" it cannot fail to qualify under section 801 as its only policies are defined therein as life insurance policies. In this argument Superior relies upon Commissioner of Internal Revenue v. Oregon Mutual Life Insurance Company, 112 F.2d 468 (9th Cir. 1940) aff'd 311 U.S. 267, 61 S.Ct. 207, 85 L.Ed. 180 (1940). The case involved the identical language to that relied upon by Superior in the Revenue Act of 1921. The case involved policies of combined life, health and accident insurance and it was held

that all insurance reserves maintained with respect to such policies qualified as life insurance reserves.

The history of life insurance taxation above set out convinces the court of the validity of Superior's position. The government contends that the Revenue Act of 1942 narrowed the definition of a life insurance company and changed the result reached in the *Oregon Mutual* case. The government cites no authority for that contention and the court is not impressed by it. No mention appears to have been made to the *Oregon Mutual* case or to the conclusion which it reached in the legislative history of the Act of 1942. The exact language which it interpreted was retained in the statute.

There is nothing in the language of any of the Revenue Acts, or the legislative history thereof, or the case law to indicate that Congress by mistake left unchanged, in 1942 and in 1959, the provision of the statute relating to a life insurance policy combined with health and accident insurance. On the contrary, it is evident that Congress specifically intended, by leaving this language unchanged in the statute for 49 years, that such policies be encompassed and included within the meaning and intent of section 801. The argument of the Internal Revenue Service that it was intended by Congress, with the passage of the Revenue Act of 1942, to exclude policies such as those issued by Superior, is not persuasive. If this be true, Congress would certainly have omitted the language of the statute relating to such policies.

It appears that Congress chose to correct inadequacies in taxation of the insurance industry by providing in both 1942 and 1959 basic changes in the method of computing the tax rather than by changes restricting the definition of life insurance companies. *Oregon Mutual* held that reserves for life, accident and health policies qualified as life insurance reserves. *Alinco* held that short term life insurance issued in a consumer credit situation was life insurance within the meaning of section 801. The two cases require the conclusion that Superior is-

suing only short term policies of life, health and accident insurance in connection with a consumer loan also qualify as life insurance company within the ambit of section 801 of the Code. Specific analysis of the language of section 801 makes clear the correctness of Superior's position. As noted, the initial language of section 801(a), viz., "life insurance * * * contracts (either separately or combined with health and accident insurance)" is unchanged since 1921. In 1942, the next phrase "or noncancellable contracts of health and accident insurance" was added. It is inconceivable that Congress would use the word "noncancellable" in the phrase added in 1942 and not in the parenthetical phrase unless a difference was intended. If Congress had meant that only noncancellable accident and health insurance qualified, the parenthetical phrase would obviously read "(either separately or combined with *noncancellable* health and accident insurance)."

The government argues:

> If the plaintiff's argument were correct, it could qualify a predominantly accident and health company merely by combining their policies with nominal life insurance policies. Manifestly, the qualification of a life insurance company should not be held to depend upon whether it issues two separate pieces of paper rather than one.

An assumption that this court would be without power to rule that the insurance company in such case did not qualify as a life insurance company, is necessarily predicated upon the completely fallacious assumption that this court, in applying a statute enacted by the Congress of the United States, must rigidly apply the literal language of the statute without regard to what Congress intended those words to mean. It goes without saying that this court, in applying section 801, considers not only the literal meaning of the words employed by Congress, but also, the result Congress intended to be reached in using those words. Were the life insurance benefits nominal, this court would undoubtedly conclude, and

correctly so, that the insurance policy in question was not a "life insurance * * * contract * * * combined with health and accident insurance," for the obvious reason that Congress, in using the term "life insurance" intended that such term encompass life insurance policies with meaningful life insurance benefits, as opposed to a nominal benefit. Moreover, the Board of Tax Appeals, in C.P.A. Company v. Commissioner of Internal Revenue, 45 B.T.A. 365 (1941), aff'd per curiam 134 F.2d 616 (6th Cir. 1943), reached this result in a case involving an insurance company issuing a policy combining a nominal death benefit with a substantially larger accident and health benefit, and held that the insurance company did not qualify as a life insurance company under a predecessor of section 801. Thus, any contention by the government that this court, or any court, would be powerless to act in such a case is without merit.

Section 801(b) (1) (A) contains the words "estimate" and "morbidity tables." Superior's expert witness, Arthur C. Eddy, testified that the word "morbidity" was a term relating to accident and health insurance. The word "estimated" in section 801(b) (1) (A) obviously was used by Congress so that there would be no question but that reserves, which were actuarily estimated as opposed to being precisely actuarily calculated, would qualify under section 801 (b). As above noted, the gross unearned premium reserves maintained on accident and health insurance consist of two elements: (i) the morbidity portion and (ii) the loading. In that accident and health reserves consist solely of the *gross premiums (which are based on actuarial calculations and an assumed rate of interest) charged the policyholder*, the reserve maintained by Superior on accident and health insurance would necessarily be based upon morbidity tables and assumed rates of interest.

The court concludes that all of Superior's insurance reserves qualify as life insurance reserves (the mortality reserve, the reserves maintained on the accident and health insurance, even if included in the gross amount thereof, as opposed to the net amount thereof, and the Liability Account carried by Stephenson, if allocated) because its reserves were held for the fulfillment of contracts which, by statutory definition, make an insurance company a life insurance company. Therefore, even if the government had been found correct in its contentions on the first two issues in this case, Superior would nonetheless qualify as a life insurance company under section 801 for each of the taxable years in question, and be entitled to the relief prayed for in its Complaint as, in each of such years, its life insurance reserves comprised more than 50% of its total insurance reserves.

(II) Does the term "cost of carrying the insurance risk" mean the gross amount of an accident and health insurance premium, or the net amount thereof?

The parties are in disagreement as to the amount of Superior's accident and health insurance reserves (and the Liability Account, if allocated), which should be taken into account in determining whether Superior qualifies as a life insurance company under section 801. The government contends that the gross amount of the accident and health insurance reserves and the gross amount of the Liability Account should be included in "total reserves" but not in "life insurance reserves." Superior, on the other hand, contends that only the morbidity portion of both its accident and health insurance reserves and the Liability Account, if allocated (which it established at trial to be 32% thereof) should be included in "total reserves" if such reserves are held to be not includable in "life insurance reserves."

Section 1.801–3(e) of the regulations, defines an unearned premium reserve as "those amounts which shall cover the *cost of carrying the insurance risk* for the period for which the premiums have been paid in advance." [Emphasis added.] The government contends that the term "cost of carrying the insurance

risk" as applied to unearned premiums on accident and health insurance means the gross amount of such reserves unreduced by the loading (the gross unearned premium reserve). Superior contends (as was testified at trial) that the term "cost of carrying the insurance risk," when applied to accident and health insurance, means the morbidity cost. Superior bases its contentions on the grounds that accident and health insurance has historically been reserved on a gross unearned premium basis, unreduced by any expenses of the company (such as the agent's commission even though incurred upon the issuance of the policy) and that the definition contained in the regulations was adopted with full knowledge of this fact and with full knowledge of the fact that the insurance industry has, for many years, used the term "gross unearned premium reserve" to describe reserves on accident and health insurance. In addition, Superior points out that "cost of carrying the insurance risk" is an awkward manner of saying "gross unearned premium reserve," which would have been quite simple for the Internal Revenue Service to say if it had intended that accident and health reserves be comprised of the gross unearned premiums.

In the *Alinco* case this point was resolved against the government. The Court of Claims in discussing section 1.801–3(e) of the regulations, stated:

It is entirely clear that 'the cost of carrying the insurance risk' is the net, not the gross, premium. And, in the case of life insurance, the net (or 'risk') premium is the [mortality] reserve. (373 F.2d at p. 354.)

■ Relying upon the *Alinco* case the court concludes that the amount of Superior's accident and health insurance reserves (including the Liability Account) to be included in "total reserves" under section 801(c) for the purpose of determining whether Superior qualified as a life insurance company under section 801, is the morbidity portion only of its gross unearned premium reserves, which was equal to 32% of the Liability Account as of December 31 of each of the

taxable years in question, the gross amounts of which are set forth in paragraphs (9) and (10) of the Findings. This court further concludes, therefore, that Superior qualified as a life insurance company under section 801 for each of the taxable years in question and is entitled to the relief prayed for in its Complaint, as, in each of such years, its life insurance reserves comprised more than 50% of its total insurance reserves.

(III) Were Superior's policies "noncancellable life, health or accident insurance policies?"

■ The term "noncancellable" applies only to accident insurance and has no meaning in relation to life insurance. (*Alinco*, 373 F.2d at 354). As indicated above the court does not think the requirement that the policy be noncancellable is applicable where life, health and accident benefits are provided in the same policy.

However, if the court is there in error, it does not think the credit policies here at issue can be termed noncancellable. Section 1.801–3 of the regulations defines noncancellable life, health or accident policies as follows:

(c) *Noncancellable life, health, or accident insurance policy*. The term "noncancellable life, health, or accident insurance policy" means a health and accident contract, or a health and accident contract combined with a life insurance or annuity contract, which the insurance company is under an obligation to renew or continue at a specified premium and with respect to which a reserve in addition to the unearned premiums (as defined in paragraph (e) of this section) must be carried to cover that obligation. Such a health and accident contract shall be considered noncancellable even though it states a termination date at a stipulated age, if, with respect to the health and accident contract, such age termination date is 60 or over. Such a contract, however, shall not be considered to be noncancellable after the age termination date stipulated in the

contract has passed. However, if the age termination date stipulated in the contract occurs during the period covered by a premium received by the life insurance company prior to such date, and the company cannot cancel or modify the contract during such period, the age termination date shall be deemed to occur at the expiration of the period for which the premium has been received.

From the above definition, it can be seen that the accident and health portion of the policies involved here are not non-cancellable within the meaning of the Code since the policies automatically terminate when the loan is paid up and not when the policyholder reaches 60. The definition of a noncancellable policy which is set forth in the regulations is generally accepted by the industry as the definition of a noncancellable policy. The defendant's argument on this aspect of the case is strongly supported by the recent decision of the Court of Appeals for the Fifth Circuit in the case of Group Life & Health Insurance Company v. United States, 434 F.2d 115 (5th Cir. 1970).

Therefore on this issue the government must prevail.

ORDER FOR JUDGMENT

On the basis of the foregoing Findings of Fact and Conclusions of Law, it is, therefore,

Adjudged and Decreed that the plaintiff, Superior Life Insurance Company, have recovery and judgment against the defendant, United States of America, in the amount of its Claims for Refund of Federal Income Taxes for each of the taxable years in question, together with interest paid thereon to the date of payment, and statutory interest of six percent (6%) per annum on such amounts from the date of payment, as was prayed for by the plaintiff in its Complaint.

*And it is so ordered.*